**Milton BORGER and Richard Borger,
Plaintiffs-Appellees,**

v.

**YAMAHA INTERNATIONAL
CORPORATION,
Defendant-Appellant.**

No. 541, Docket 79–7447.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1979.

Decided May 29, 1980.

John P. Arness, Washington, D.C. (Hogan & Hartson, Washington, D.C., Miller, Montgomery, Sogi, Brady & Taft, New York City, on brief), for defendant-appellant.

Patricia Goughan, New York City (Hammond & Morton, P. C., Wells Burgess, New York City, on brief), for plaintiffs-appellees.

Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and CARTER, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

This is an appeal by Yamaha International Corporation (Yamaha) from a judgment entered against it in the United States District Court for the Southern District of New York for violations of section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs were awarded $454,158.00 (after trebling) in monetary damages and $125,000.00 in attorneys' fees. For the reasons set forth below, we reverse and remand for a new trial.

## I

## FACTS

Yamaha, a California corporation, is the United States importer of various consumer products, including sporting goods, musical instruments, and high fidelity audio equipment. This case involves a line of audio products—amplifiers, pre-amplifiers, tuners, turntables, speakers, receivers, and tape decks—imported and distributed by Yamaha's Audio Products Division for ultimate resale to consumers in the United States.

---

* The Honorable Robert L. Carter, United States District Judge for the Southern District of New York, sitting by designation.

Yamaha distributes these audio products under the brand name "Yamaha" through franchised dealers in a limited distribution system. Under this system Yamaha selects a limited number of retail dealers in a given area and enters into franchise agreements with only those dealers.[1] Franchised dealers agree, among other things, to promote Yamaha products with at least as much effort as is extended for competitive lines, to maintain adequate display and demonstration facilities, including at least one separate sound room, to employ qualified sales personnel, and to promote good consumer relations. Yamaha agrees to provide national advertising, to update and improve the products, to offer training sessions for sales and service personnel, to provide sales literature, to maintain warranty service stations, and to permit franchised dealers to use the "Yamaha" trademark in their advertising and promotions. A Yamaha franchise is not exclusive; rather, the franchise agreement contains a clause permitting sales of Yamaha products only from the location or locations specified in the agreement. Yamaha's tremendous growth in audio sales volume, from approximately $1 million in 1973 to approximately $42 million in 1977, attests to the effectiveness of its marketing strategy.

Under Yamaha's distribution network, the nation is divided geographically into sales districts and regions. The metropolitan New York City area is in District 12 of the Eastern Region. In early 1976, the person responsible for activities in District 12 was Joseph Thal of Regional Sales Consultants, Inc., a corporation that acted as the local representative of several manufacturers. At the same time, Steve Rosenfeld was the Eastern Regional Manager of Yamaha's Audio Products Division and Stewart Greenberg was its National Sales Manager.

Appellees are brothers and partners, doing business as Borger's Hardware and Supply Company, also known as "Borger's Stereo", "Borger's Audio", or simply "Borger's". Borger's is essentially a family enterprise, started by appellees' parents in the early part of the century. At first, Borger's handled hardware, housewares, and building maintenance supplies, but the business subsequently expanded to include sales of refrigerators, washing machines, and televisions. After Milton Borger's son, Robert, joined the business as General Manager in 1972, Borger's moved strongly into the field of audio equipment. Throughout this time, Borger's did business from a location on the East Side of Manhattan on Second Avenue between 73d and 74th Streets.

In its early sales of audio equipment, Borger's pursued a marketing strategy that involved heavy advertising of substantial discounts off manufacturers' suggested retail prices. The lines sold in this fashion were brand names that were widely distributed, the manufacturers of these brands placing few or no restrictions on the number or quality of retail outlets selling their products. Because these lines were widely distributed, they lent themselves to heavy intrabrand competition and were generally sold on very low margins of profit. Concerned about its low profits, Borger's decided sometime in 1975 to change marketing strategy and obtain limited distribution lines, which permitted higher profit margins because of less intrabrand competition. As part of its altered approach, Borger's planned to build a new store that would have the high class display facilities, sound rooms, experienced sales personnel and service facilities generally required by the limited distribution lines.

Construction of Borger's new store, which was located on the West Side of Manhattan at 130 West 72d Street, began in 1975, and the store opened for business on October 7, 1976. During construction, Robert Borger, armed with artists' renditions of the com-

---

1. To become a franchised dealer, a retailer must be recommended by the local Yamaha sales representative to the Regional Manager and by the Regional Manager to Yamaha's Audio Products Division headquarters in California. The prospective dealer must then be ac- cepted by the management of the Audio Products Division and by Yamaha's Credit Department. Although an applicant can be rejected at any level of this multi-tiered screening process, final acceptance can come only from top management in California.

pleted store and a series of newspaper ads showing Borger's transition away from heavy discounting, set out to attract some of the limited distribution lines, including Yamaha.[2] He contacted Yamaha's local representative, Joe Thal, by telephone sometime in February or March of 1976. Thal informed him that Yamaha was experiencing a product shortage which precluded the appointment of new dealers at that time but stated that perhaps they could talk about Borger's later on in June at the Consumer Electronics Show in Chicago. Robert and Milton Borger did meet with various Yamaha representatives including Thal, Rosenfeld, and Greenberg at the June Show, and it appears that from this point in time Borger's was under consideration as a potential Yamaha franchisee.

After the Consumer Electronics Show, contact between Borger's and the Thal organization was maintained through Thal's employee, Rene Norell. Norell visited Borger's West Side store two or three times during the summer months to see how construction was progressing. In the fall, Thal himself visited the store, inspected it, and apparently liked what he saw. He testified that as of the time of this visit he was definitely of the opinion that he would recommend Borger's as a Yamaha dealer. Thal told the Borgers that Yamaha's new Eastern Regional Manager, Michael Dalgaard, would meet with them sometime after the store opened.

The Dalgaard meeting took place in mid-October or early November 1976, at the new store. After a brief tour of the store, Dalgaard, accompanied by Arthur Broder of Thal's organization, met with Robert Borger in the audio room of the store, where they discussed various aspects of a potential franchise arrangement, including display and stocking requirements. Robert Borger testified that as the discussion drew to a close Dalgaard shook his hand and said either "congratulations" or "welcome aboard". Later, according to Borger's testi-

mony, Dalgaard mentioned that Broder would stop by the following day to take an order and obtain the necessary credit information.[*]

In fact, Broder did not return the next day or any other day. Borger testified that he subsequently received a phone call from Dalgaard during which Dalgaard informed him there was a problem and refused to commit himself as to when, if ever, Borger's could expect to begin receiving Yamaha products. No further action was taken by either party until sometime in June 1977, when Robert Borger telephoned Thal's successor and inquired as to the status of Borger's request to become a Yamaha dealer. Borger followed up his phone call with a mailgram expressing his disappointment over what he characterized as "broken promises" on the part of Yamaha.

Dalgaard responded with a letter in which he denied having assured Borger's of a franchise, and stated: "Three (3) days after my visit I personally told Mr. Joe Thal and his people that based on negative results of our dealer canvas [sic] we absolutely would *NOT OPEN* Borger as a Yamaha account. I also asked Joe to convey this to you personally and do it as soon as possible." (Emphasis in original).

The dealer canvass referred to by Dalgaard consisted of separate phone calls or visits by Dalgaard to two existing Yamaha dealers in Manhattan during which the subject of Borger's appointment as a Yamaha dealer was discussed. Neither dealer was enthusiastic about the possibility of another Yamaha dealership in Manhattan. Both testified at trial that their primary concern was the shortage of Yamaha products and the likelihood that the addition of a new dealer would make it more difficult for them to obtain those products in the quantities they desired. There was no evidence that these two dealers had discussed Borger's application for a Yamaha franchise with one another or with any other Yamaha dealers.

---

**2.** Although the record is not very clear on this point, it appears that the lines acquired by Borger's since October 1976 include at least

Luxman, Dahlquist, Advent, Mitsubishi, Dayton-Wright, Optonica, and Matsushita.

On August 27, 1977, Borger's commenced this action, alleging that Yamaha and its dealers had violated section 1 of the Sherman Act by participating in a group boycott or a concerted refusal to deal with Borger's. In a second count, Borger's alleged that the concerted refusal to deal was part of a conspiracy to fix prices for Yamaha products at an artificially high level, also in violation of section 1. Although the complaint was later amended to include causes of action alleging breach of contract and promissory estoppel, the district judge refused to submit these counts to the jury. He also found the evidence insufficient to support the *per se* theories of antitrust liability that were urged by Borger's. Proceeding under a rule of reason approach, he submitted four special interrogatories to the jury,[3] which ultimately returned a verdict in favor of plaintiffs. The court then trebled the damages and awarded attorneys' fees pursuant to 15 U.S.C. § 15.

## II

## DISCUSSION

Appellant makes three principal challenges to the judgment below. First, it contends there was insufficient evidence to support the jury's finding that it had entered into a combination or contract with one or more of its dealers within the meaning of the Sherman Act. As a corollary to this, Yamaha argues that the jury was not properly instructed concerning the propriety of consultations between a manufacturer and its franchised dealers. Second, Yamaha argues that even if there was a combination or contract, the court erred in its instructions on the issue of the reasonableness of any resulting restraint of trade. Finally, appellant urges that the trial court erred in its instructions on the issue of damages.

### A. Sufficiency of Evidence.

Section 1 of the Sherman Act provides that any contract, combination, or conspiracy, in restraint of trade or commerce among the several states, is illegal. In keeping with this language, the first special interrogatory submitted to the jury was whether defendant had entered into a combination or contract as defined in the instructions of the court. Because the court had instructed the jury that there was no evidence to support a finding of horizontal combination or contract, the question for the jury was whether Yamaha had entered into a vertical combination with one or both of the dealers with whom it consulted prior to rejecting Borger's application.

Borger's contends that Yamaha's failure to move within ten days for judgment n. o. v. as required by Fed.R.Civ.P. 50(b) precludes it from seeking appellate review of the sufficiency of the evidence to support the jury's affirmative finding. *See Johnson v. New York, N.H. & H.R.R.*, 344 U.S. 48, 50, 73 S.Ct. 125, 126, 97 L.Ed. 77 (1952); *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217–18, 67 S.Ct. 752, 756, 91 L.Ed. 849 (1947); *Quinby v. Morrow*, 340 F.2d 584, 585 (2d Cir. 1965); *McKee v. Sheraton-Russell, Inc.*, 268 F.2d 669, 671–72 (2d Cir. 1959). Appellant's explanation for its failure to file a timely motion is that it never received notice of entry of judgment. When it learned that judgment had been entered, it moved to vacate and reenter the judgment so that it could then move for judgment n. o. v.

In denying the motion, the trial court held that appellant had shown no valid excuse for failing to ascertain promptly when judgment was entered and waiting two and one-half months after verdict to seek Rule 50(b) relief. The trial court also stated:

---

**3.** The four interrogatories read:

1. Do you find that defendant entered into a combination or contract as defined in the instructions of the Court?

2. If your answer to Question 1 is Yes, do you find that such combination or contract unreasonably restrained trade, as defined in the instructions of the Court?

3. If your answer to Questions 1 and 2 are Yes, do you find that the combination or contract caused injury to the business of plaintiffs?

4. If your answer to Questions 1–3 are Yes, what amount of damages do you find?

[T]he only points sought to be raised by a judgment n. o. v. are points already ruled on at the trial after most extensive argument. The judgment n. o. v. motion is thus only a useless formality to comply with some possible appellate notion of what is required to "complete the record." There is no need to occupy the courts with such exercises.

Unfortunately for appellant, this is not so. A judgment n. o. v. motion is not a useless formality for complying with an appellate motion. "In the absence of such a motion, [this Court is] without power to direct the District Court to enter judgment contrary to the one it had permitted to stand." *Cone v. West Virginia Pulp & Paper Co., supra,* 330 U.S. at 218, 67 S.Ct. at 756; *see Guarnieri v. Kewanee-Ross Corp.,* 270 F.2d 575, 580 (2d Cir. 1959). If there were a complete absence of any evidence to support the jury's verdict, we might be tempted to adopt Justice Frankfurter's argument that Rule 50(b) does not require some "abracadabra of obedience to it", *Johnson v. New York, N.H. & H.R.R., supra,* 344 U.S. at 57, 73 S.Ct. at 130 (Frankfurter, J., dissenting), or we might suggest as we did in *McKee v. Sheraton-Russell, Inc., supra,* 268 F.2d at 672–73, what the disposition should be on retrial. However, the issue is sufficiently close that we think it should not be passed upon in the first instance by this Court, and we will not do so.

█ Although we now proceed to discuss certain trial errors for the benefit of the district court on retrial, this does not mean necessarily that we believe the evidence to be sufficient to warrant a retrial. We reach no conclusion on that issue. *Cf. Otten v. Stonewall Insurance Co.,* 538 F.2d 210, 213 (8th Cir. 1976). Yamaha has lost its right to seek appellate review of the adequacy of Borger's proof on the concluded trial. *See Basciano v. Reinecke,* 313 F.2d 542 (2d Cir. 1963). However, it will not be prevented by the law of the case doctrine from seeking such review of the evidence presented on retrial.

## B. Consultations with Dealers.

The trial court charged that before the jury could find the existence of a combination or contract, it had to find that one or both of the dealers canvassed by Yamaha requested that a dealership not be granted to Borger's and that Yamaha, either expressly or impliedly, agreed with one or both not to take on Borger's as a dealer. Although Yamaha does not seriously take issue with this portion of the charge, it contends that the jury should also have been told that a manufacturer may properly consult with its dealers about the subject of taking on a new dealer and that such consultation alone does not constitute an express or implied agreement. An instruction to this effect was requested by Yamaha, and at one point during the trial the court itself proposed a similar instruction which it indicated might be given. However, the charge, as given, was simply that a unilateral decision by Yamaha, not involving an express or implied agreement with an existing dealer, would not be a combination or contract under section 1.

█ So far as it went, this was a correct statement of the law. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1030–31 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). The question is whether it went far enough. Where, as here, the evidence of a vertical combination is largely inferential, it is important that a jury understand how such an agreement comes into being. In fairness to Yamaha, the jury should have been instructed that it was not improper for Yamaha to consult with its dealers and that those consultations, standing alone, would not establish the existence of a combination or agreement under the Sherman Act. *DuPont Glore Forgon, Inc. v. American Tel. & Tel. Co.,* 437 F.Supp. 1104, 1124–26 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1367 (2d Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 481 (1978); *Sheldon Pontiac v. Pontiac Motor Division, General Motors Corp.,* 418 F.Supp. 1024, 1029–30 (D.N.J.1976), *aff'd,* 566 F.2d 1170 (3d Cir. 1977).

Because reversal is mandated on other grounds, we need not decide whether the trial court's failure to give this additional instruction, standing alone, would call for reversal. We suggest, however, that the district judge amplify his charge in this area when the case is retried.

C. Reasonableness.

 Although the Sherman Act speaks of restraint of trade in absolute terms, it has long been established that section 1 proscribes only unreasonable restraints. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Certain business relationships are deemed unreasonable *per se*, however, "because of their pernicious effect on competition and lack of any redeeming virtue." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Examples of *per se* unreasonable arrangements are horizontal territorial restrictions, *United States v. Topco Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), group boycotts, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959), horizontal price-fixing schemes, *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951), and vertical price-fixing schemes, *United States v. Parke-Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

Finding no evidence of horizontal combination, group boycott, nor "anything like price-fixing," the trial court concluded correctly that the rule of reason standard applied. It then proceeded, however, to postulate factual situations in which the determination of reasonableness would be made substantially on a *per se* basis. The Court instructed the jury in part that "[i]f Borger's was in all respects qualified to be a Yamaha dealer and the sole purpose of Yamaha was to protect Harmony or Harvey, or both, from competition, that would be an unreasonable purpose and that would render any agreement of the kind we are talking about an unreasonable restraint of trade within the doctrine of the Sherman

Act." That instruction is similar to the one held erroneous in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), and is equally erroneous.

In *Oreck*, plaintiff, a distributor of vacuum cleaners, alleged that Whirlpool had refused to renew its distributorship agreement at the behest of Sears, Roebuck & Co., which distributed Whirlpool cleaners under the Kenmore label. Oreck's termination left Sears as the sole distributor of Whirlpool cleaners in the United States and Canada, and Oreck contended that the reason for the termination was Sears' desire to end competition from Oreck. The trial court in that case instructed the jury to find defendant liable if it found an agreement between Whirlpool and Sears for the purpose of excluding Oreck from the market for vacuum cleaners generally or Whirlpool cleaners in particular. A divided panel of this Court reversed, 563 F.2d 54 (2d Cir. 1977), and, upon a rehearing en banc, the court concurred in the judgment of the panel majority.

Writing for the en banc majority, Judge Anderson stated that under the district court's instructions, "the jury could simply have found an agreement by Sears and Whirlpool to exclude Oreck from the sale of Whirlpool vacuum cleaners and, *on that basis*, have found them guilty (as it in fact did) of a *per se* violation of § 1 of the Sherman Act." 579 F.2d at 129 (emphasis in original). This, he said, was improper. As he explained in his original opinion:

> Oreck was required to show not only conspiratorial conduct by Sears and Whirlpool . . . but also credible proof that the net result and effect of the allegedly conspiratorial conduct of the defendants was anti-competitive in the vacuum cleaner industry as a whole or that the conspiracy was designed to drive Oreck out of the vacuum cleaner business.

563 F.2d at 58.

In his en banc opinion, Judge Anderson said:

In this case, therefore, something more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown. The agreement becomes violative of § 1 of the Sherman Act only if it is *anticompetitive in purpose or effect*—in sum, it must be tested by the rule of reason. Without any consideration of the anti-competitive purpose or effect, arbitrarily seeking to protect Oreck simply because Whirlpool refused to renew a contract with Oreck which had terminated by its own terms, even though this refusal was in whole or in part, due to persuasion by Sears, disregards the well established rule that "the anti-trust laws . . . were enacted for 'the protection of *competition* not *competitors* . . . .'"

579 F.2d at 133–34 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)) (emphasis in original).

█ Borger's makes much of the fact that, although Judge Anderson talked about anti-competitive "result and effect" in his original opinion, he discussed anticompetitive "purpose or effect" when writing for the en banc court. Borger's argues that the disjunctive phraseology of the en banc opinion supports the challenged jury instructions in the instant case despite the fact that the district court talked only in terms of purpose and not of effect. This argument is based on a misconception of the principles enunciated in *Oreck*. Even if the *Oreck* rule, as Borger's calls it, is a disjunctive rule, which we doubt but need not now determine,[4] the Court clearly intended that the anti-competitive purpose or effect of the vertical restriction in that case

had to be judged with respect to the vacuum cleaner industry as a whole, not simply that portion which handled the Whirlpool brand. *Oreck* followed *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–59, 97 S.Ct. 2549, 2559–2562, 53 L.Ed.2d 568 (1977), which held that vertical restrictions aimed at intrabrand competition do not necessarily have an adverse effect on interbrand competition, described by the Court as the "primary concern of antitrust law." *Id.* at 52 n. 19, 97 S.Ct. at 2558; *see also Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1116–17 (5th Cir. 1979); *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111, 113 (5th Cir. 1979); *Harold Freidman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 143 & n.67 (3d Cir. 1978). In the instant case, the jury was instructed to find Yamaha liable solely on the basis of a purpose to restrict intrabrand competition, without any finding of either a purpose or effect related to interbrand competition. This was reversible error.

█ Although the district court found no evidence of "anything like price-fixing" and stated that he would not submit that *per se* theory of liability to the jury, he charged, nonetheless, that if Yamaha's sole purpose was to protect the dealers from price competition or discounting, this would be an unreasonable and unlawful purpose. It is undisputed that Borger's had decided in 1975 to move out of the discounting business, and the very reason it sought a Yamaha franchise for its new store was to secure a limited distribution line which did not require cut-rate discounting. There is no evidence that Yamaha exerted any pressure upon Borger's to reach this already made decision. This is hardly the stuff

4. Although there are numerous judicial statements to the effect that agreements may violate section 1 if unreasonable restraint was either their object or effect, *see, e.g., Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *United States v. Columbia Steel Co.*, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948), it is difficult to conceive of a viable private action for damages under section 1 if some unreasonable restraint has not been effected. The Fifth Circuit has clearly held that

in the absence of an anti-competitive effect, an unlawful or evil intent will not suffice to establish a rule of reason violation. *See H & B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 90 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). *See also Bormans, Inc. v. Great Scott Supermarkets, Inc.*, 433 F.Supp. 343, 348–49 (E.D. Mich.1975).

upon which an illegal price-maintenance finding can be based. *Aladdin Oil Co. v. Texaco, Inc., supra,* 603 F.2d at 1117–18; *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.,* 523 F.2d 668, 673–74 (9th Cir. 1975). Assuming, for the argument, that the evidence would support this as a viable alternative theory of liability, it is impossible to tell which path the jury followed in reaching its verdict. Accordingly, the verdict cannot stand. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962).

### D. Damages.

■ Yamaha argues that the district court should have limited the jury's consideration of Borger's damages to those incurred up to the time of the filing of the complaint, or, at the latest, to the time of the trial. We agree. The district court instructed the jury that it might wish to consider whether Yamaha's refusal to grant Borger's a franchise "was a kind of short-term, contingent thing, or was it indefinite, final, unlimited in time . . . something that could be reopened shortly, or after a certain period of time, or . . . a flat unconditional turndown with no indication of an opportunity to reopen them." He then stated that "[a]ll of that relates in some way to a logical analysis of what is the length of time involved in injury and damages from this refusal to deal."

We assume, although it is not at all clear from the court's instructions, that it was permitting the jury to determine whether Borger's damages arose from a one-time, final, and irrevocable refusal to deal or from a refusal that was of a continuing nature and resulted in repeated wrongs. If so, the district court did not explain to the jury why it was important that this issue be resolved. In any event, it is doubtful whether the question was for the jury.

■ In section 1 actions involving refusals to deal, plaintiffs usually claim damages arising from anti-competitive conduct on the part of the defendant which is of a continuing nature. Accordingly, recovery is generally limited to damages suffered to the date of filing the complaint, *Connecticut Importing Co. v. Frankfort Distilleries, Inc.,* 101 F.2d 79, 81 (2d Cir. 1939); *Washington State Bowling Prop. Ass'n. v. Pacific Lanes, Inc.,* 356 F.2d 371, 377 (9th Cir.), *cert. denied,* 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966); *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 394–96 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), although in an appropriate case the trial court may permit supplementation of the complaint to allow for recovery of damages up to the time of trial. *See Shayne v. Madison Square Garden Corp.,* 491 F.2d 397, 401 (2d Cir. 1974). Causes of action for future damages will accrue on the date they are suffered. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). A contrary rule would make the defendant immune from liability after the statute of limitations had run on his original act of wrongdoing, despite the fact that plaintiff continued to suffer because of his exclusion from the pertinent market. *Id.* at 340, 91 S.Ct. at 807; *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 125–28 (5th Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); *see Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 327–29, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955).

On the record in this case, it would be pure speculation for the jury to determine that Yamaha's refusal to grant Borger's a franchise was forever irrevocable and award future profits for some equally speculative period. *See Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 401 U.S. at 339, 91 S.Ct. at 806; *Connecticut Importing Co. v. Frankfort Distilleries, Inc., supra,* 101 F.2d at 81.

■ The district court also instructed the jury that it could award lost profits which Borger's would have earned from the Yamaha dealership had it been given. This was not completely accurate. The proper measure of damages was the overall business loss sustained by Borger's because it was without the Yamaha line, *i.e.,* the com-

petitive injury to its business. *GAF Corp. v. Circle Floor Co., Inc.*, 463 F.2d 752, 759 (2d Cir. 1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). Store space that would have been occupied by Yamaha products was obviously not left empty. Advertising that would have been devoted to Yamaha was devoted to other products. Employees' sales efforts were similarly diverted. Under Borger's duty to mitigate damages, it would have been remiss if it had not taken reasonable steps to merchandise substitute lines. *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1360 (2d Cir. 1976); *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 436 (5th Cir. 1977). To the extent that Borger's profits from the sale of other products increased as a result of its diverted emphasis or would have increased had reasonable sales efforts been taken, Borger's was not entitled to recover from Yamaha.[5] The district judge should have made this clearer than he did. Assuming, as Borger's contended at trial, that the impact of its loss of the Yamaha line could not be lessened by sales of other lines because Yamaha was a specialty brand that had achieved a significant level of brand insistence among consumers, the trial judge failed to adequately alert the jury of its duty to resolve this crucial issue when taking into account Borger's duty to mitigate damages.

Reversed and remanded for a new trial.

5. Moreover, if the sale of other products similar to Yamaha's could be used as a gauge for what Yamaha sales would have been, allowance had to be made for the diversion of sales efforts from Yamaha to the other products and the increased profits resulting from that diversion.