**BUSINESS ELECTRONICS CORPORA-TION, Plaintiff-Appellee,**

v.

**SHARP ELECTRONICS CORPORA-TION, Defendant-Appellant.**

No. 84–2618.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1986.

Rehearing and Rehearing En Banc Denied Feb. 20, 1986.

---

David Harvin, Scott J. Atlas, Houston, Tex., Peter J. Gartland, Lawrence M. Har-nett, Lance Gotthoffer, Peter A. Dankin, New York City, for defendant-appellant.

Gary V. McGowan, H. Lee Godfrey, Kenneth S. Marks, Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, and THORNBERRY and JONES, Circuit Judges.

CLARK, Chief Judge:

Defendant-appellant Sharp Electronics Corporation (Sharp) appeals from a jury verdict in favor of plaintiff-appellee Business Electronics Corporation (BEC), a former dealer in Sharp calculators, in BEC's claim that Sharp committed a *per se* violation of section one of the Sherman Act by agreeing with a competing dealer to terminate BEC because of its price cutting. Sharp contends that (1) the district court erred in instructing that it must find *per se* liability without regard to any agreement on price, (2) the evidence was insufficient to support a jury finding of *per se* liability, (3) there should be no rule of *per se* liability in vertical price fixing cases, (4) the district court committed prejudicial error in making certain evidentiary rulings and (5) the district court accepted an erroneous measure of damages. Because the jury was improperly instructed on point (1), we reverse and remand for a new trial.

I

Sharp is a supplier of various consumer and business products, including electronic calculators, throughout the United States. Sharp distributed its calculators through a network of retail dealers that bought the calculators from Sharp and resold them to end users. Sharp provided retail price lists which suggested resale prices to its dealers.

In 1968, Sharp appointed Kelton Ehrensberger as its sole electronic calculator dealer in the Houston area. Ehrensberger later incorporated as BEC and continued his

dealership under that name. BEC's sales strategy involved keeping retail prices low and BEC often sold at prices lower than those on Sharp's retail price lists.

It is apparent that, several years after Ehrensberger became a Sharp calculator dealer, Sharp became dissatisfied with BEC's performance. The parties disagree, however, on the reason for Sharp's dissatisfaction. Sharp presented evidence that BEC failed to meet sales quotas and that Sharp remonstrated with it for this poor sales performance. BEC, on the other hand, presented evidence that Sharp was concerned about BEC's discounting and wanted BEC to "clean up [its] pricing structure."

In mid-1972, Sharp's problems with BEC led to the appointment of Gilbert Hartwell as a Sharp calculator dealer in the Houston area. The record indicates that Sharp may have initially promised Hartwell that his dealership would be exclusive, but Sharp subsequently decided to retain BEC until more was learned about the market.

Hartwell was very upset about BEC's pricing policies and suggested to Ehrensberger that the dealers avoid a "discount" situation. He also complained bitterly to Sharp that BEC was undercutting him in the market. There was evidence that Sharp shared Hartwell's concern, although Hartwell testified that Sharp consistently told him that it could not tell BEC what prices to charge. Hartwell also testified that he was not concerned about BEC's price cutting in general but only about BEC's "free riding" on Hartwell's investment in product promotion and other sales-related services. He stated that the customers which he developed through these means would then buy from BEC at lower prices.

In June, 1973, Hartwell presented an ultimatum to Sharp—unless Sharp terminated BEC within 30 days, Hartwell would terminate his own Sharp dealership. Sharp responded by terminating BEC.

The evidence showed that Hartwell usually, but not always, adhered to Sharp's suggested retail prices. According to Hartwell's testimony, he was under no obligation to sell at any particular price. The prices of Sharp calculators have dropped since 1973.

## II

The district court submitted this case to the jury on the theory that an agreement between Sharp and Hartwell to terminate BEC because of the latter's price cutting constitutes a *per se* violation of section one of the Sherman Act. The district court charged the jury:

The Sherman Act is violated when a seller enters into an agreement or understanding with one of its dealers to terminate another dealer because of the other dealer's price cutting. Plaintiff contends that Sharp terminated Business Electronics in furtherance of Hartwell's desire to eliminate Business Electronics as a price-cutting rival.

The court also submitted a special interrogatory to the jury, which it described as follows:

Question number 1 asks you whether you find by a preponderance of the evidence that there was an agreement or understanding between Sharp and Hartwell to terminate Business Electronics as a Sharp dealer because of Business Electronics' price-cutting.

This theory, which does not require an agreement between Sharp and Hartwell to maintain resale prices, is an incorrect one. This court's decision in *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir.1979), demonstrates both the error committed in this case and the proper standard of liability. In *Aladdin Oil,* the plaintiff sought to acquire the assets of a Texaco distributorship which was going out of business. However, defendant Texaco, the supplier of oil and gasoline products, consulted with defendant Powertram, the other Texaco distributor in the area, and decided that Texaco did not need two distributors in the same area. Therefore Texaco, which had an option to purchase the failing distributorship, decided to assign its option to Pow-

ertram and prevent the plaintiff from acquiring a distributorship in competition with Powertram. This court held that this conduct alone did not violate the antitrust laws. The fact that plaintiff alleged that Texaco and Powertram had prevented it from acquiring a distributorship in order to lessen intrabrand competition made no difference because "abstract lessening of intrabrand competition is not enough." *Id.* at 1116. The court indicated, however, that had Texaco's action been taken pursuant to a price maintenance agreement with Powertram, it would have violated the antitrust laws. *Id.* at 1117.

■ Similarly, in the present case it was not enough for the jury to find that BEC was terminated to reduce price competition; the jury should have been required to find that the termination was pursuant to a price maintenance agreement between Sharp and Hartwell. *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028, 1050 (Fla.Dist.Ct.App.1984); *see also Borger v. Yamaha Int'l Corp.,* 625 F.2d 390, 397 (2d Cir.1980) (improper for jury instructions to state that a dealer termination was unlawful "solely on the basis of a purpose to restrict intraband competition"). Additional support for this proposition may be found in *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 294–95 (5th Cir.1981), where the court treated the termination of a dealer, apparently to protect another dealer from "intense competitive pricing," as a vertical non-price restraint to be tested under the rule of reason. *See also Joe Regueira, Inc. v. American Distilling Co., Inc.,* 642 F.2d 826, 833 (5th Cir.1981) (plaintiff was required to show that its termination "was the result of a combination ... which had as its purpose or effect the *fixing* of wholesale and retail prices") (emphasis added). An example of the type of instruction that would have been proper in this case may be found in *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 428 n. 14 (5th Cir.1985).

We recognize that the standard of liability we set forth conflicts with the rule enunciated in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 170 (3d Cir.1979) and followed by a number of other circuits. *E.g., Victorian House, Inc. v. Fisher Camuto Corp.,* 1985–2 Trade Cases ¶ 66,706 at 63,382 (8th Cir. July 18, 1985); *Zidell Exploration, Inc. v. Conval Int'l, Ltd.,* 719 F.2d 1465, 1469 (9th Cir.1983); *Bostick Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207, 1215 (4th Cir.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983). The *Cernuto* rule is that "if a manufacturer deliberately withdraws its product from a price-cutting distributor at the request of a competing distributor as part of a conspiracy to protect the requesting distributor from price competition, the manufacturer has committed a per se violation of the antitrust laws." *Zidell, supra,* 719 F.2d at 1469. The courts following this rule reason that if the manufacturer and dealer wish to protect the dealer from price competition then they must intend that prices be higher once the price-cutting dealer is terminated.

This circuit has not adopted this reasoning. *See St. Petersburg Yacht Charters, supra,* 457 So.2d at 1048–49 (citing *Muenster Butane, Inc., supra,* 651 F.2d at 294–95). An agreement to terminate a price cutter does not fix prices at any specific or general level but merely frees the complaining dealer to set prices as he chooses. *St. Petersburg Yacht Charters, supra,* 457 So.2d at 1043–45. It is true that the effect of terminating the price cutter may be to raise prices but this is equally true of the granting of an exclusive dealership, which we have held not to be *per se* illegal. *Carlson Machine Tools, Inc. v. American Tool, Inc.,* 678 F.2d 1253, 1259 (5th Cir.1982) (the grant of an exclusive dealership is not a *per se* violation of the Sherman Act because "such a grant does not seek to impose resale price maintenance on the distributor"). Any vertical non-price restriction may affect resale prices, yet the Supreme Court has held that such restrictions are nonetheless to be evaluated under the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 57, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568, 584 (1977).

■ The Supreme Court's recent decision in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775, *reh'g denied,* — U.S. ——, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984), further confirms that this circuit's divergence from the *Cernuto* rationale is correct. In *Monsanto,* the Court held that an antitrust plaintiff cannot survive a directed verdict motion merely by showing a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors. *Id.* at 759, 104 S.Ct. at 1468. The Court noted two important distinctions in distributor-termination cases. The first is the distinction between concerted and independent action—only the former is proscribed by the Sherman Act. *Id.* at ——, 104 S.Ct. at 1469. Thus, under *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), it is permissible for a manufacturer, acting independently, to terminate any distributor for its failure to comply with the manufacturer's suggested retail prices.

■ The second distinction is between concerted action to set prices and concerted action on non-price restriction—the former is illegal *per se* while the latter is evaluated under the rule of reason. *Id.* 465 U.S. at 761, 104 S.Ct. at 1469. The Court conceded that these distinctions are difficult to apply in practice because both the conduct of the parties and the economic effect of that conduct may be similar or identical in many cases. *Id.* at 762, 104 S.Ct. at 1470. However, in *Monsanto* the Court chose not to deal with the underlying theoretical difficulties of the *per se* rule.[1] Instead, the Court sought to ensure that legitimate conduct on the part of the manufacturers and distributors would not be penalized due to the ambiguity of the legal rule. It is perfectly legitimate, and expected, for distributors to complain about the price cutting of their rivals. It is also legitimate for a manufacturer to terminate a price cutter either independently or pursuant to a non-price agreement. The mere fact that a manufacturer terminates a price cutter following or in response to dealer complaints does not determine whether the manufacturer is acting independently, pursuant to a non-price agreement or pursuant to a price agreement. To allow evidence of termination following or in response to complaints to serve as the sole basis for the award of treble damages to the terminated dealer would tend to discourage legitimate dealer complaints and legitimate manufacturer action in the face of such complaints. By disrupting communications between manufacturer and dealer it would create "an irrational dislocation in the market." *Id.* at 764, 104 S.Ct. at 1470.

It is possible to interpret *Monsanto* as saying merely that a manufacturer can terminate a price cutter, whether or not a complaining dealer "agrees," as long as the manufacturer is acting for some reason other than "just knuckling under to the [complaining dealer's] desire for less competition." *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 744 (7th Cir.1982). Such an interpretation could make *Monsanto* consistent with *Cernuto.* *Id.; see also Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). However, this interpretation would lead to the very "irrational dislocations" that *Monsanto* sought to avoid. The jury, under *Cernuto,* is required to determine whether the

---

1. The validity of distinction between vertical price restraints and non-price restraints has been the subject of scholarly discussion. *See, e.g.,* Bork, Vertical Restraints: Schwinn Overruled, 1977 Sup.Ct.Rev. 171, 180–81 (1977); Posner, The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision, 45 U.Chi.L.Rev. 1, 7–8 (1977). Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U.Chi.L.Rev. 6, 9 (1981).

Sharp urges us to evaluate all vertical restraints under the rule of reason. This argument faces a long history of the application of the *per se* rule against vertical price restraints. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Our resolution of this case makes it unnecessary for us to reach or rule on Sharp's contention.

manufacturer's motivation was one of terminating "free riders" or one of reducing price competition, yet in either case the manufacturer's attitude will be one of hostility toward price cutters. As Judge Posner has put it, there is a "certain unreality" in trying to tell these motivations apart. *Valley Liquors, supra*, 678 F.2d at 744. Therefore, the manufacturer which desires to terminate a price cutter because of its free riding will be deterred from this legitimate action because it is indistinguishable, except perhaps to a mind reader, from what *Cernuto* prohibits, i.e., termination of a price cutter because of its price cutting.

The instant case well illustrates the problem. If, confronted with Hartwell's complaints, Sharp determined that BEC's price cutting was undermining Hartwell's incentive to promote Sharp calculators (or simply that it was preferable to terminate BEC because of its poor sales record), Sharp had a perfect right to terminate BEC. Sharp's legal counsel, however, would be unable to advise Sharp of a means of safely accomplishing termination if, as under *Cernuto*, Sharp's antitrust liability turned solely on a jury's guess as to Sharp's motivation. Thus, Sharp would be prevented from exercising its legal rights merely because its information originated in a dealer complaint, the very "irrational dislocation" *Monsanto* sought to prevent.[2]

*Monsanto* did not expressly disapprove the *Cernuto* rule. Indeed, the Court cited, in support of its holding, cases such as *Sweeney, supra*, which follow *Cernuto*. However, the issue in *Monsanto* was the quantity of evidence necessary to infer a price fixing agreement, not whether it was necessary to show such an agreement at all. Nothing in *Monsanto* suggests that liability can be found without any evidence

of a price fixing agreement. Rather, the language of *Monsanto* can only indicate the Court's belief that a price fixing agreement is a requirement for *per se* liability in distributor-termination cases. For example, the Court indicated that a plaintiff must show that the "distributors are not making independent pricing decisions." *Monsanto, supra*, 465 U.S. at ——, 104 S.Ct. at 1470. The Court also stated that "it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages." *Id.* Finally, the Court defined the concept of "common scheme" as including communication between the parties as to an agreement on price. *Id.* at 764, n. 9, 104 S.Ct. at 1471 n. 9.

■ For these reasons we hold that, in order for a manufacturer's termination of a distributor to be illegal *per se*, it must be pursuant to a price maintenance agreement with another distributor. That distributor must expressly or impliedly agree to set its prices at some level, though not a specific one. The distributor cannot retain complete freedom to set whatever price it chooses. The jury instructions in this case failed to reflect this standard and therefore were critically defective.[3]

### III

■ Sharp contends that the evidence is insufficient to raise a jury issue as to whether Sharp and Hartwell entered into a price maintenance agreement. Sharp therefore argues that we should reverse the district court's denial of its motions for directed verdict and for judgment notwith-

---

**2.** [D]ealer complaining is likely whenever there is discounting by free riders, because most dealers are harmed by such conduct. The manufacturers cannot prevent the complaining. Yet if it occurs the manufacturer may have to abandon even nonprice restrictions in distribution, because any action it takes against a discounter may be deemed to be tainted by price-fixing.

Posner, The Next Step, *supra* note 1, at 13.

**3.** If, on retrial, the district court again chooses to use special interrogatories, it may wish to follow either the form of the first interrogatory in *Monsanto*, 465 U.S. ——, n. 2, 104 S.Ct. 1467, n. 2 or the bifurcated form of the first and second interrogatories in *Pierce v. Ramsey Winch*, 753 F.2d at 422, 423 n. 6.

standing the verdict and order BEC's complaint dismissed.

When a party moves for a judgment as a matter of law, the court should consider the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969). A court may only take a case from the jury if the evidence is such that reasonable men could arrive at only one verdict. *Id.* To grant the relief sought by Sharp, we should also test the proof in terms of a fact finder operating under the proper legal concepts articulated in Part II above.

Applying this standard to the case at bar, we hold that the evidence was sufficient to support a properly instructed jury verdict in BEC's favor. While it is true that there was little, if any, direct evidence that Sharp and Hartwell reached an agreement as to price, we think the jury reasonably could infer such an agreement from the evidence as a whole.

There was evidence that, even before Hartwell became a dealer, Sharp sought BEC's adherence to the suggested retail price list. BEC produced evidence tending to show that it was not "free-riding" and that its sales performance was equal to Hartwell's. The logical inferences from such evidence, if drawn by the jury, could support a finding that BEC's termination was not due to the reasons Sharp suggests. *See Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 474 (3d Cir.1985).

In addition, there was evidence that Hartwell usually followed Sharp's suggested prices. There was also evidence that Hartwell sought to encourage BEC to follow these prices. Finally, the record shows that Hartwell complained vigorously to Sharp about BEC's pricing and that ultimately Sharp responded by terminating BEC. This evidence, taken as a whole and viewed in the light most favorable to BEC, could support an inference that Sharp and Hartwell had agreed that Hartwell would follow Sharp's suggested retail prices and that BEC's termination was pursuant to this agreement.

For these reasons Sharp was not entitled to judgment as a matter of law.

## IV

The critical error in the jury instructions alone requires reversal. Two further issues should be addressed because they are likely to arise on retrial. The first issue involves an evidentiary ruling. At trial, Sharp sought to introduce certain documents to confirm its policy of terminating dealers who failed to meet sales quotas. Defendant's Exhibit 52 is a Sharp document sent to Sharp Vice-President H. Kawai, one of the men responsible for BEC's termination, in May, 1972. The document indicates that BEC made only 45% of its sales quota. Defendant's Exhibit 53 is a Sharp document sent to sales representatives and managers, as well as Kawai, in May, 1972; it states that dealers who fall below 50% quota should be replaced.

Sharp contends that the district court erroneously excluded these documents as hearsay. We agree. " 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Sharp was not offering these documents for the purpose of proving the truth of the statements contained therein. Defendant's Exhibit 52 was not offered to show that BEC had only made 45% of its quota but to show Sharp *believed* BEC had only made 45% of its quota. *See Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1322 (11th Cir.1982) (corporate memoranda concerning employee's performance were admissible, not to show that employee actually performed poorly, but to show that corporation believed that employee's performance was poor). Defendant's Exhibit 53 was offered to show that Kawai, who *received* the document, believed that Sharp's policy was to terminate dealers who fell below 50% of quota, whether or not this was in fact Sharp's policy.

Exhibit 53 would also be admissible for the purpose of showing what

Sharp's policy actually was because it did not directly declare that "termination is Sharp's policy" but merely indicated that policy indirectly by saying that dealers falling below 50% of quota should be replaced. *See* McCormick, *Evidence* § 249. Even if hearsay, the document would fall within the "state of mind" exception. Fed.R.Evid. 803(3).

The district court's memorandum and order indicated that even if the excluded documents were admissible, they related to policies and states of mind "too far removed in time from the termination to be relevant." Although the district court has broad discretion in the admission of evidence, *Carlton v. Shelton*, 722 F.2d 203, 206 (5th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984), that discretion was improperly exercised here. Much of the evidence BEC relies upon relates to Sharp's actions long before the termination. Indeed, the district court properly admitted Plaintiff's Exhibit 6, a Sharp document from February 1971, which reflected Sharp's policy at that time of enforcing minimum retail pricing on another product line. Exhibits 52 and 53 provide explanations for Sharp's actions other than a pure concern for BEC's pricing. Furthermore, the fact that Sharp believed in 1972 that BEC had only met 45% of its quota is relevant to its decision to terminate BEC, when faced with an ultimatum from a more successful dealer, one year later. It was error to exclude Defendant's Exhibits 52 and 53.

◾ Defendant's Exhibits 54 and 55 are Sharp documents that were received by Thomas Burkholder, Sharp's Texas representative, in May and September, 1972. They set Burkholder's sales quota and indicate the importance of meeting that quota. Exhibits 54 and 55 were also improperly excluded as hearsay. They were offered to show their effect on Burkholder, i.e., to show that he was under pressure to meet sales quotas. The district court correctly ruled that Defendant's Exhibits 54 and 55, which did not relate to dealer performance or quotas, were not sufficiently relevant to be admissible.

## V

The second issue involves Sharp's contention that the district court accepted an erroneous method of computing damages. First, Sharp claims that Hartwell's sales should not have been used as a yardstick to measure BEC's damages. Second, Sharp argues that the plaintiff's damage expert improperly used BEC's gross profit margin, instead of Hartwell's lower gross profit margin, to calculate damages.

◾ An antitrust plaintiff is not required to "prove with exact particularity what its success might have been in the market in the absence of illegal conduct of another." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 995 (5th Cir. 1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). The use of Hartwell as a yardstick was reasonable because he sold the same product in the same area. He sold to similar customers. While both were in business, their sales volume was roughly equivalent. Furthermore, there was evidence that BEC's expenses were lower than those of Hartwell. Although Sharp pointed to possible defects in the method used by BEC, consideration of such defects was properly left to the jury since the method chosen was not a matter of pure speculation. *Pierce v. Ramsey Winch, supra,* 753 F.2d at 440. We conclude that the district court did not err in accepting BEC's method of calculation damages.

## VI

The district court correctly ruled that Sharp was not entitled to a judgment as a matter of law. We reverse the judgment appealed from because the case was submitted to the jury on an erroneous theory of liability. We remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

EDITH HOLLAN JONES, Circuit Judge, concurring:

I concur in the judgment requiring remand for retrial because this court is bound by the decision in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). However, I believe this case perfectly illustrates the arguments why vertical price restraints should be tested under antitrust's Rule of Reason [1] rather than, as *Monsanto* continues to require, per se illegality. There is no social benefit to subjecting manufacturers' pricing relationships with their distributors to potential per se illegality where they operate in markets whose interbrand competitiveness overwhelms any detrimental effects of those relationships. And, although *Monsanto* moves toward alleviating the threat of unwarranted treble-damage actions, the abiding uncertainty suggests that the Supreme Court would more wisely jettison the precedent that led to the rule of per se illegality for vertical price restraints.

The flaws in *Monsanto's* continued recognition of per se illegality are highlighted by this case. First, it is difficult to conceive how, in the real world, the subjection of vertical price restraints to per se illegality improves the functioning of the economy or enhances consumer welfare. Only atavistic devotees of the abacus or slide rule could fail to recall the remarkable history of the electronic calculator market during the last fifteen years. The range of available models, variety of functions that can be performed, and myriad optional enhancements have multiplied rapidly while the average prices have plummeted. The number of competing manufacturers has increased. To maintain their market position and profitability, manufacturers like Sharp have obviously been required to react quickly and imaginatively to changes in the marketplace. The record in this case reveals that both Sharp's market share and the retail prices of its calculators were declining in this period.[2] Nevertheless, as the result of the current state of antitrust law, Sharp is potentially held accountable in treble damages for terminating a distributor who, in Sharp's perception, failed to market its product adequately. To hold, as this court must, that Sharp cannot respond to changing market conditions with all of the competitive arrows in its quiver including, if necessary, a program to respond to "free riders" like BEC,[3] is to put Sharp at a potential competitive disadvantage. To limit Sharp's marketing options for its calculators may also limit the range of products available to the consumer of calculators. *See* Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135 (1984). To isolate one factor in the relationship of Sharp and its distributors, i.e. whether Sharp required them to adhere to its published retail price lists, in this hectically competitive market is to ignore the fact that here have been no anticompetitive effects of the conduct in issue: prices declined and the number and quality of competing products increased. The larger conclusion that can be drawn from the scenario of this case is that assuming the continued variety, vitality and innovation of the American free enterprise system, it is unrealistic to conclude that measures taken by a manufacturer to enhance his product's marketability, whether related to price or not, are anticompetitive unless they are part of a program to enforce a manufacturer- or dealer-level cartel. *See* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution:*

---

1. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

2. Sharp faced 100 competitors. The prices of its calculators ranged from $500–1,000 in 1972 to $150–300 ten years later.

3. "Free riders" are distributors who market products by cutting their prices, to the neglect of customer and market-development services, which are performed by the distributor who has kept margins higher by not discounting. Frequently, the "free rider's" sales benefit from the services performed by the full-price dealer. *See* Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U.Chi.L.Rev. 1, 6–10 (1977).

*Per Se Legality,* 48 U.Chi.L.Rev. 6, 25 (1981).

As the majority opinion elegantly demonstrates, *Monsanto* has raised the level of proof required to submit a vertical price restraint case to the jury. However, its second flaw is that, despite so doing, it leaves a cloud of uncertainty and incongruity. The *Monsanto* standard, a "something more" formulation of a vertical price agreement,[4] provides little guidance for lower courts and counsel. Already, the Eighth Circuit has affirmed a finding of per se liability based upon a "price-related" conspiracy, which is totally at odds with today's interpretation of *Monsanto* by this Circuit. *See Victorian House Inc. v. Fisher Camuto Corp.,* 769 F.2d 466, 469 (8th Cir.1985); *compare Bender v. Southland Corp.,* 749 F.2d 1205 (6th Cir.1984). Most clever attorneys, like plaintiff's counsel in this case, will be able to generate sufficient evidence, even pursuant to the *Monsanto* standard, to withstand summary judgment review, and thus to exert substantial influence toward settlement of cases where no anticompetitive harm, or harm to the consuming public, really occurred. Moreover, the distinction between vertical price and non-price restraints can be difficult to draw, and because *Monsanto* retains a powerful incentive to describe a dealer's antitrust complaints as being price-related, in order to secure the litigational benefit of the per se standard, such distinctions can be expected to be even more finely (and uselessly) articulated. *See generally* Hay, *Vertical Restraints after Monsanto,* 70 Cornell L.Rev. 418, 431–35 (1985). Retention of the per se test of illegality for vertical price maintenance will thus continue to inhibit the functioning of non-price restraints which the Supreme Court sees as generally beneficial. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In sum, the antitrust law of vertical restraints remains much in turmoil, to the detriment of potential defendants and the public, which suffer due to the limitation of distributional variety, but to the benefit of the legal class.

Semantic nuances are costly to businessmen in the real world. The Supreme Court has noted that, "per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive.... '[T]here are certain agreements and practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (quoted in *Continental T.V., Inc. v. GTE Sylvania Inc., supra,* 433 U.S. at 50, 97 S.Ct. at 2557).[5] Present economic understanding does not compel per se treatment of vertical price restrictions. On the contrary, Judge Easterbrook's analysis of *Monsanto* would appear to be correct:

> If restricted dealing and price arrangements are ordinarily procompetitive, if there is no real difference between the effects of price and non-price restraints, and if the objection to [vertical price restraints] is the same as that to other vertical restraints, then it follows that per se condemnation of [vertical price restraints] is anomalous.

Easterbrook, *supra* at 171. The Supreme Court should take the earliest opportunity to review its Russian roulette approach to vertical price restraints.

---

**4.** 104 S.Ct. at 1471 n. 9 ("evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer").

**5.** For a discussion of the quirky and questionable legal history of the per se rule in vertical price restraint cases, see Brief of the United States as Amicus Curiae to the Supreme Court in the *Monsanto* case; see also Easterbrook, *supra.*