**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John M. GROFF and Curtis Turbyfill,
Defendants-Appellants.**

**Nos. 78–5437 and 78–5480.**

United States Court of Appeals,
Sixth Circuit.

Argued April 1, 1980.

Decided Feb. 27, 1981.

Rehearing Denied July 7, 1981.

James K. Robinson, U. S. Atty., Detroit, Mich., Marshall Tamor Golding, Washington, D. C., Sidney M. Glazer, Dept. of Justice, Appellate Section, Criminal Division, Washington, D. C., for appellee in both cases.

Thomas N. Howard, Francis Higgins, Detroit, Mich., for appellant in case no. 78–5480.

Leah A. Simms, Detroit Strike Force, Detroit, Mich., for appellee in case no. 78–5480.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Appellants John M. Groff and Curtis Turbyfill, with seven others, were named as defendants in a ten-count indictment charging substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and (d) (1976) (counts 1 and 2); three wire fraud offenses, 18 U.S.C. § 1343 (1976) (counts 3, 4 and 5); four extortionate credit collection offenses, 18 U.S.C. § 894 (1976) (counts 6 through 9); and one count of travel in interstate commerce to collect a debt by extortionate means, 18 U.S.C. § 1952 (1976) (count 10).

Turbyfill was charged in counts 1, 2, 3, 4, 7 and 8. Groff was charged in counts 1 and 2. The trial court dismissed the wire fraud charges (counts 3 and 4) against Turbyfill and the jury acquitted him of the extortionate credit collection charges (counts 7 and 8). He was convicted, however, on the substantive and conspiracy racketeering enterprise charges (counts 1 and 2). Groff was convicted of the substantive racketeering enterprise offense (count 1), but was acquitted of conspiracy (count 2).

Both appeals challenge the sufficiency of the evidence to sustain appellants' conviction and Groff further alleges that the indictment was insufficient to inform him of the charges against him. We disagree and affirm.

I.

Turbyfill was involved in the "scams" run on Charles Wicks, Kenneth Pichette and Gordon Glaser, while Groff was involved only with the scam on Wicks. These scams took place in the context of a much larger enterprise which is detailed in the opinion filed in the companion case, *United States v. Morelli*, No. 79–5031, 643 F.2d 402 (6th Cir.), also decided today. The evidence produced at trial depicted Turbyfill's and Groff's involvement with the enterprise's scams as follows.

Luca and LaPuma met with Groff at a bar on a visit to Warren, Ohio. While at the bar, Groff introduced them to Charles Wicks, whom Groff had known for some time. After Wicks left, Groff suggested to Luca and LaPuma that they could cheat Wicks at cards. On a later visit to Warren, Ohio, during which Turbyfill accompanied Luca, a card game with Wicks was arranged. Both Groff and Turbyfill acted as players. Wicks lost more than $10,000 in this game. Since Wicks was able to pay only $200 to $300 at the time, Groff assured the others that he would call or see Wicks about picking up the balance.

Later, Turbyfill again accompanied Luca to Warren, Ohio, this time to pick up a $3,000 to $4,000 payment on the debt. Luca then informed Wicks that the Groff brothers would pick up the rest. Luca engaged in numerous interstate telephone conversations with the Groffs concerning collection of Wicks' debt. Some time later, Wicks gave Groff a deed to some property. Groff and his brother sold the property and gave the proceeds to LaPuma, for which they received $1,000. The proceeds from the sale of this property were insufficient to satisfy Wicks' debt. Luca, Turbyfill and Vito Cappozoli then went to Warren, Ohio to intimidate Wicks into paying the debt. Cappozoli was dressed as, and apparently looked like, a mob hit man. They received a check from Wicks that later bounced. Eventually, the full debt was collected. Turbyfill also accompanied Luca and others to a racetrack in West Virginia to see Wicks. Another card game was played at the Waterford Inn. Wicks lost an additional $1,200 during this game and extortionate means were used to collect this debt.

Turbyfill played in other rigged card games in which the victims were bilked of substantial sums of money. He also participated in the collection of the resulting debts. In late 1971 or early 1972, Turbyfill played in a game at Luca's apartment in Warren, Michigan, during which Kenneth Pichette lost $3,000. Turbyfill later accompanied Luca on a few visits to collect Pichette's debt. Turbyfill also played in the second game that Luca and LaPuma set up

with Gordon Glaser. During this game, Glaser lost between $2,000 and $3,000. The next day, Turbyfill participated in a discussion with Luca and LaPuma concerning the best method for collecting Glaser's gambling debt. They decided that Luca should collect this debt. Extortionate efforts were eventually used to do so.

At the close of the government's case, all defendants moved for a directed verdict of acquittal. In an extensive opinion delivered from the bench, Senior United States District Judge Ralph M. Freeman considered the motions of each defendant with respect to each count. Initially, he noted that both defendants agreed that the first two requirements of a RICO enterprise violation had been proven: the enterprise existed and it was engaged in and its activities affected interstate commerce. Judge Freeman then thoroughly analyzed the evidence against each defendant.

John Groff could not be convicted of the substantive RICO violation on the pattern of racketeering theory, Judge Freeman held. There was no evidence of Groff's involvement in the enterprise other than his participation in the extortionate credit collection alleged in count 7. Since this could establish only a single predicate crime, no pattern was shown on Groff's part. Groff could not be chargeable with the other predicate crimes committed by the conspirators because those crimes were not, in Judge Freeman's words, "in any way related to or a foreseeable result of the immediate purposes for which Groff joined the conspiracy, that being to win money from Wicks in a card game in Warren, Ohio." The jury could decide Groff's guilt on the substantive RICO charge under the collection of an unlawful debt theory, however, since there was evidence presented that Groff participated in the card game that led to Wicks' debt and since Groff received and sold certain property of Wicks to satisfy this debt.

The jury, Judge Freeman ruled, could find Curtis Turbyfill guilty of engaging in a pattern of racketeering activity, but only the conduct alleged in counts 7, 8, 9 and 10

could be used as the basis for such finding. Regarding count 7, sufficient evidence was presented that Turbyfill participated in the card game in Warren, Ohio which resulted in Wicks' debt, that he participated in conversations which dealt with ways to instill fear in Wicks to collect the debt, and that he accompanied Luca and Cappozoli on a trip to Warren, Ohio in an attempt to intimidate Wicks into paying the debt. Although Turbyfill did not directly participate in the extortionate debt collection alleged in count 8, the jury could reasonably infer from his involvement in the first Wicks scheme that he participated in the West Virginia card game knowing that any debt unpaid by Wicks would be the subject of a later extortion.

Turbyfill did not participate in the first card game with Glaser which gave rise to the extortionate credit collection alleged in count 9. Judge Freeman ruled, however, that the conduct alleged in count 9 could be used as a basis for establishing a pattern of racketeering activity on Turbyfill's part. Since Turbyfill participated in the second card game with Glaser, and since the jury could reasonably infer that extortion was a foreseeable result of attempts to obtain money from Glaser, it was a substantial crime committed in furtherance of the immediate objectives for which Turbyfill joined the conspiracy. Although Turbyfill did not directly participate in the interstate telephone calls from Luca to Wicks and the Groff brothers that led to the charges in count 10, there was substantial evidence from which the jury could conclude that Turbyfill traveled from Michigan to Ohio for the purpose of facilitating the extortion of Charles Wicks.

Judge Freeman also ruled, however, that the activities alleged in counts 3, 4 and 6 could not be used to establish a pattern of racketeering activity on Turbyfill's part. There was not enough evidence, in Judge Freeman's view, to connect Turbyfill with the two acts of wire fraud alleged in counts 3 and 4. Since the Pichette debt collection occurred prior to the Wicks and Glaser scams, Turbyfill could not have known at

the time of LaPuma's extortionate debt collection techniques. He could not, therefore, be held criminally liable for the extortionate acts in collecting the debt alleged in count 6.

Finally, Judge Freeman held that the government could go to the jury with the RICO count against Turbyfill under the collection of an unlawful debt theory. There was evidence presented that Turbyfill accompanied Luca and Cappozoli to Warren, Ohio to collect the Wicks debt and that he accompanied Luca to Pichette's home to collect that debt. He also participated in the card game with Wicks in West Virginia and in the second game with Glaser. The collection of these unlawful debts was foreseeable.

Our view of the record convinces us that in considering and ruling upon the various motions for directed verdict, Judge Freeman used an abundance of caution and was always mindful of the dangers which attend prosecution under so broad an Act as RICO.

### II.

■ The defendants principally complain that since they were not convicted of any of the predicate crimes alleged, it necessarily followed that they could not have been guilty of the RICO counts. The statute clearly does not support this position. As Judge Freeman recognized, RICO imposes criminal liability under either of two theories.

First, RICO imposes liability upon any person who conducts or participates in the conduct of an enterprise's affairs through a "pattern of racketeering activity." 18 U.S.C. § 1962(c) (1976). A "pattern of racketeering activity" is defined as the commission of two acts specified in 18 U.S.C. § 1961(1) (1976) within the statutory time period. 18 U.S.C. § 1961(5) (1976). An acquittal on either of these two predicate offenses, then, would absolve the defendant of criminal responsibility for engaging in a pattern of racketeering activity.

Second, RICO imposes liability upon any person who conducts or participates in the conduct of an enterprise's affairs through

the "collection of an unlawful debt." 18 U.S.C. § 1962(c) (1976). Since this is an independent basis for RICO liability, an acquittal on any charges predicate to liability on the "pattern of racketeering activity" theory does not affect the validity of a conviction under RICO for engaging in the collection of unlawful debts.

Both Groff and Turbyfill were shown to have been fully aware of the existence and nature of the enterprise and to have participated in it. Both had a stake in the outcome and reaped the benefits from their activity. While Turbyfill was not convicted of the predicate crimes with which he was charged, he, like Groff, was unquestionably involved in the collection of unlawful debts.

■ Groff further contends that the government failed to establish the interstate nature of his individual debt collection activities. He claims that only "1 event at 1 time in 1 situation for 1 victim in 1 State for 1 purpose and maybe 1 violation ..." was shown by the government. Notwithstanding the fact that no serious claim with respect to this issue was raised at the time of the motion for directed verdict, we find no merit in it. While we believe that Groff has substantially understated his own role in the activities, we agree with Judge Freeman that this argument "completely misses the thrust of the interstate element of section 1962." It is the enterprise, not the individual defendant, which must engage in or affect interstate commerce.

### III.

■ Finally, Groff complains that the indictment failed to sufficiently inform him of the charges against him. Specifically, Groff states that the indictment was pleaded in a conclusory fashion, in general statutory language, rather than in plain, concise and definite language, as required by Rule 7, Federal Rules of Criminal Procedure; that certain subsections of RICO were miscited; and that the indictment alleged violations of certain Michigan statutes whereas the government attempted to prove violations of similar Ohio and West Virginia statutes.

Since the substantive and conspiracy RICO charges against Groff went to the jury only on the collection of an unlawful debt theory, we may safely ignore those parts of the indictment alleging a pattern of racketeering activity on his part. Since Groff was found not guilty of the conspiracy count, we need look only at the substantive RICO charge contained in count one of the indictment. The operative parts of the indictment then become:

### COUNT ONE

18 U.S.C. § 1962(c) – CONDUCTING AN ENTERPRISE . . . THROUGH COLLECTION OF UNLAWFUL DEBTS.

1. That from on or about December 1, 1970 through January 3, 1975, inclusive, in the Eastern District of Michigan and elsewhere, defendants, RONALD MORELLI aka "Ron", "Ronnie"; ROBERT LA PUMA aka "Bob", "Big Bob"; THOMAS MISKO aka "Tom", "Tommie"; AUGUSTINO GIORDANO aka "Augie"; CURTIS TURBYFILL; JOE MELFI; JOHN GROFF and MIKE GROFF, being associated in fact with each other and Peter Luca, thereby being persons associated with an enterprise as defined in Title 18, United States Code, Section 1964(4), which enterprise was engaged in and the activities of which affected interstate commerce, did conduct and participate directly and indirectly in the conduct of their affairs . . . through collection of unlawful debts;

\*    \*    \*    \*    \*    \*

3. The defendants, RONALD MORELLI, ROBERT LA PUMA, THOMAS MISKO, JOE MELFI, CURTIS TURBYFILL, JOHN GROFF and MIKE GROFF, did at various times herein participate and attempt to participate in the collection of unlawful debts, as defined by Title 18, United States Code, Section 1961(c), namely, the collection of debts and claims of money incurred or contracted in gambling and wagering activities and in connection with the business of gambling as described in paragraph 2(A) above,[1] in violation of the laws of the State of Michigan; namely, Michigan Compiled Laws, Sections 750.157(a)(b), 750.301 and 750.314, as follows:

\*    \*    \*    \*    \*    \*

3) From on or about February 1, 1972 to on or about September 30, 1972, said defendants obtained monies and participated in the collection of divers sums from Charles Wicks in the Eastern District of Michigan and elsewhere.

A review of the operative parts of the indictment convinces us that it was not so conclusory, ambiguous, or indefinite that Groff was unable adequately to prepare his defense. That the indictment tracked the statutory language in pleading the offense in no way prejudiced the defendant. As the Supreme Court reaffirmed in *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1973) (quoting *United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882)): "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" Here, the indictment clearly alleges that Groff, among others, participated in a card game with Charles Wicks, and that he participated in

---

1. Paragraph 2(A) of count one of the indictment, describing the alleged pattern of racketeering activity, states in pertinent part:

A. RONALD MORELLI, ROBERT LA PUMA, THOMAS MISKO, CURTIS TURBYFILL and JOE MELFI did finance and engage in unlawful gambling and games of chance including card games, dice games and liars poker with divers persons, including Charles Wicks, Ed Vervane, Jr., Kenneth Pichette and Gordon Glaser; in violation of Michigan Compiled Laws, Sections 750.157(a)(b), 750.304 and 750.314:

\*    \*    \*    \*    \*    \*

3) From on or about February 1, 1972 to on or about September 30, 1972, said defendants engaged Charles Wicks in illegal gambling and wagering activities and did obtain monies therefrom in the Eastern District of Michigan, in violation of Michigan Compiled Laws, Sections 750.157(a)(b), 750.301 and 750.314.

the collection of the resulting debt. The indictment also specifies the time period during which these activities occurred.

These activities, however, were alleged to have occurred in the Eastern District of Michigan and elsewhere. While the majority of the debt collection activities occurred outside Michigan, some acts such as Luca's telephone calls to the Groffs concerning Wicks' debt did originate in the Eastern District of Michigan. Groff, therefore, could not have been misled by this allegation.

The most disturbing error in the indictment, however, is the allegation that certain Michigan statutes were violated whereas the government's proof at trial showed violations of Ohio law. Rule 7(c)(3), Federal Rules of Criminal Procedure, states:

> Error in the citation [of the statute, rule, regulation or other provision of law which the defendant is alleged to have violated] or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

The citation of an erroneous statutory provision is not fatal to the conviction, then, if the defendant knew the nature of the charges against him. *United States v. West*, 562 F.2d 375 (6th Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *Steinert v. United States District Court for the District of Nevada*, 543 F.2d 69 (9th Cir. 1976); *United States v. Chestnut*, 533 F.2d 40 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). *See also Williams v. United States*, 168 U.S. 382, 389, 18 S.Ct. 92, 94, 42 L.Ed. 509 (1897). The court must look at the facts alleged in the indictment to determine whether an offense has been properly charged. *United States v. West, supra*, at 378–79.

The factual statements in the indictment alleged the collection of an unlawful debt incurred in gambling activities. Since gambling is a clear violation of Ohio law, the indictment sufficiently apprised Groff of the charges against him. Nor does it ap-

pear that Groff would have altered his defense in any way had the Ohio statutes been cited. The incorrect citation of Michigan law, therefore, constitutes harmless error.

 Under a similar rationale, the miscitation of certain subsections of RICO in the indictment also constitutes harmless error. The citation of RICO provisions were many times technically erroneous, but they were not so misleading as to impair Groff's defense.

Affirmed.