**NORTH CENTRAL WATT
COUNT, INC.**

v.

**WATT COUNT ENGINEERING
SYSTEMS, INC., et al.**

No. 3–86–0836.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 2, 1988.

Michael A. Meyer, David N. Burn, Burn & Meyer, Nashville, Tenn., for plaintiff also for third-party defendants Ray Busby and Allen Bowman.

Gail P. Pigg, Nashville, Tenn., for defendant.

Henry E. Hildebrand, Jane P. North, Passino, Delaney & Hildebrand, Nashville, Tenn., for third-party defendant Michael Busby.

## MEMORANDUM

WISEMAN, Chief Judge.

Plaintiff North Central Watt Count, Inc. (NCWC) initiated this lawsuit in September, 1986 against defendants Watt Count Engineering Systems, Inc. (WCES), Watt Count Marketing Corporation (WCM), Watt Count of Middle Tennessee, Inc. (WCMT), and several individually-named defendants.[1] In its complaint, NCWC alleged that defendants violated both the Sherman Act, 15 U.S.C. § 1 et seq. (1973), and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–68 (1984). In October, 1986, the Court issued a preliminary injunction against defendants, restraining them from engaging in certain types of activity.[2] Defendants subsequently moved to dismiss NCWC's complaint for failing to state a claim upon which relief could be granted and for lack of subject-matter jurisdiction. The Court denied defendants' motions on July 2, 1987. The case is presently before the Court on cross-motions for summary judgment filed by NCWC and defendants on both the antitrust and RICO claims. For the reasons explained below, the Court denies both NCWC's and defendants' motions for summary judgment on the antitrust claim, and grants defendants' motion for summary judgment on the RICO claim.

### I. *Factual Background*

#### A. *The Watt Count Organization and System*

WCES and WCM, its wholly-owned subsidiary, form the basis of a business organization that provides and markets energy conservation systems primarily for new and existing single and multi-family residential housing units. WCES, the parent corporation, provides computerized engineering analyses, designs insulation, ventilation and air-conditioning specifications, and issues written guarantees which insure that annual energy consumption levels in units equipped with the Watt Count System will not exceed a particular guaranteed amount. The issuance of these written guarantees is what distinguishes the service provided by the Watt Count Organization from that provided by other energy conservation system businesses.[3] In re-

---

1. The individually-named defendants are all members of WCES' Board of Directors: Donald Terrell, Keith Crowe, Reese Smith, Jr., Reese Smith, III, Stephen B. Smith, and W.C. Allen. Defendants Terrell, Crowe, Smith, Jr., Smith, III, and Stephen Smith were also members of WCMT's Board of Directors.

2. Specifically, the Court enjoined defendants from:

    1. Refusing to provide engineering, design or other consulting or support services to North Central Watt Count;

    2. Refusing to sell heatshield, caulking or other materials or supplies which defendants offer for sale to Watt Count franchises and/or refusing to sell or attempting to sell such items at prices which are higher than the regularly posted prices for such items;

    3. Revoking or suspending plaintiff's Watt Count franchise or engaging in, or attempting to do any act to restrict plaintiff's business activities to any specified area;

    4. Engaging in any other conduct or causing others to engage in any conduct which would restrict or interfere with plaintiff's conduct of business under its Watt Count franchise.

In doing so, the Court held that NCWC had shown a likelihood of success on the merits of its antitrust claim.

3. Various companies throughout the Middle and Northern Tennessee area provide services similar to those provided by Watt Count. Only Your Energy Service, however, issues a written

turn for its services, WCES charges its area dealers a flat rate of fourteen cents per square foot of conditioned living space.[4]

WCM is the marketing arm of the Watt Count Organization. Although its primary function is to sell Watt Count area dealerships, WCM also provides area dealers with certain technical support, and marketing and promotional aids and supplies. In return for its services, WCM receives approximately four percent of an area dealer's gross sales.

The Watt Count System is actually promoted, sold, and installed by Watt Count area dealers. At the time this lawsuit was filed, Watt Count area dealers were located in several states.[5] In addition to caulking the framework of a structure, blowing insulation into cavities created by wall t's and corners, and installing heatshield—a metallized polyethylene material that is placed between the structure's insulation and dry wall on virtually all exterior walls and top-floor ceilings—area dealers inspect the installation of insulation, and heating and cooling duct systems to make certain that such installation complies with the design specifications provided by WCES.

### B. *The Present Dispute*

In essence, this lawsuit involves a rather convoluted territorial dispute between two Watt Count area dealers—NCWC and WCMT. WCMT first became associated with the Watt Count Organization in 1982 when it purchased the Watt Count area dealership for Williamson County, Tennessee.[6] Shortly thereafter, WCMT purchased the Watt Count area dealership for Davidson County, Tennessee.[7] Defendants Keith

Crowe, Reese Smith, Jr., Reese Smith, III, and Stephen B. Smith were the original shareholders of WCMT and were members of WCMT's original Board of Directors. Defendant Donald Terrell was a member of WCMT's original Board, but only recently became a WCMT shareholder. WCMT has had no other shareholders or directors since its incorporation. Although collectively the Smiths constitute a majority of WCMT's Board, defendants Terrell and Crowe are responsible for conducting WCMT's daily operations.

Like WCMT, NCWC first became involved in the Watt Count Organization in 1982. At that time, NCWC purchased the Watt Count area dealership for Sumner, Macon, Trousdale, Smith, and Wilson counties in Tennessee. NCWC originally was owned by a group of investors which included William Cutting, Charles Parks, Porter Jones, and WCES. WCES' interest in NCWC was represented by its President at the time, Michael Busby. Michael Busby, who has been named as a counterclaim defendant in this lawsuit, served as President of WCES until the fall of 1986. In 1983, the ownership of NCWC changed hands. Since that time, NCWC has been owned by Raymond Busby—Michael Busby's father and Secretary–Treasurer of NCWC—and Allen Bowman—Michael Busby's brother-in-law and President of NCWC.

Toward the latter part of 1983, WCMT learned that NCWC was actively soliciting customers and engaging in business in Davidson County. Believing that such conduct violated NCWC's dealership agreement, which WCMT interpreted as providing for exclusive sales territories,[8] defend-

guarantee similar to the one provided by Watt Count. Compared to the Watt Count Organization, Your Energy Service controls a relatively insignificant share of the relevant market.

4. For certain repeat work, however, WCES charges its area dealers seven cents per square foot of conditioned space.

5. As of April 11, 1987, there were 19 Watt Count area dealers located in nine different states. *See* Deposition of Keith Crowe at 32.

6. WCMT paid $37,500 for the Williamson County dealership.

7. WCMT paid an additional $40,000 for the Davidson County dealership.

8. Both NCWC and WCMT entered into identical dealership agreements with WCM. By the express terms of those agreements, WCM granted area dealers "the exclusive right to promote, sell, and service the Watt Count System ... in the geographic area specified in Paragraph 1.4" *See* Authorized Total Energy Center Dealership

ants Terrell and Crowe contacted Michael Busby, then President of WCES, and asked him to stop NCWC from engaging in business in WCMT's territory. According to both Michael Busby and defendant Crowe, Michael Busby informed defendants Terrell and Crowe that WCES could not legally impose territorial restrictions on NCWC in order to stop it from doing business in WCMT's territory.[9] According to defendant Terrell, however, Michael Busby informed them that he had talked to and reprimanded NCWC, and that he had taken care of the problem.[10]

In September, 1983, WCMT's attorney sent a letter to Michael Busby objecting to NCWC's continued intrusion into WCMT's territory. In a letter addressed to WCMT's attorney dated October 28, 1983, Michael Busby purportedly set forth WCES' response to WCMT's complaint. In that letter, he stated:

> First, as to the matter of exclusivity of geographical area, the franchise prospectus was prepared to provide that no other [area dealership] would be established by Watt Count in the franchisee's territory during the term of his contract....

> [T]o avoid a violation of antitrust laws, Watt Count could not prohibit the salespersons of one franchise from selling in another franchise territory.[11]

According to this letter, therefore, WCES' position, was that it never intended to restrict or prohibit salespersons of one area dealer from selling in another area dealer's territory, and that neither WCES nor any of its sales representatives made any representations to the contrary. It was WCES' belief that the most it could do was prohibit area dealers from establishing an office or place of business in another area dealer's territory.[12] This was also the understanding of both the original and present owners of NCWC.[13]

WCMT's Board was "stunned" by WCES' response. Defendants contend that at the time defendants Terrell and Crowe negotiated for the purchase of the Williamson and Davidson County area dealerships, both Michael Busby and Jim Pemberton, then President of WCM, represented that the dealership territories would be exclusive and that area dealers would not be permitted to solicit or do business in another area dealer's territory.[14] It is the de-

Agreement, Paragraph 1.1. Paragraph 1.4 of the agreements required the area dealer to operate a business, and maintain a retail sales outlet in a defined area, and provided that WCM would not grant any other "dealer franchise" in a particular geographic territory. In Paragraph 1.6 of the agreements, the area dealers acknowledged WCM's right to authorize other area dealers to sell and promote the Watt Count System "outside the geographic area specified in Paragraph 1.4." The agreements, however, did not *explicitly and unambiguously* state that one franchise's salespersons could not solicit business in another franchise's territory.

9. *See* Deposition of Michael Busby at 27; Deposition of Keith Crowe at 19.

10. *See* Deposition of Donald Terrell at 56.

11. Defendants Terrell and Crowe claim that a franchise prospectus was not used when they negotiated to purchase WCMT's two area dealerships. *See also* Affidavit of Jim Pemberton at 2 (Pemberton, along with Michael Busby, negotiated the sale of WCMT's two area dealerships on behalf of WCM). In any event, although the franchise prospectus is somewhat ambiguous, it may reasonably be construed to support defendants' claim that WCES and WCM initially intended to impose territorial sales restriction.

Section 13(ii) of the prospectus provided that "[WCM] limits the geographic area in which ... [a] franchise may promote and sell the Watt Count System." Section 13(iii) further provided that "[WCM] does provide territorial protection ... in that [it] agrees not to establish another ... franchise within the geographic area designated in the ... Dealership Agreement."

12. WCES' position is supported by the testimony of Michael Busby, Clinton Swafford, Thomas Moody, and Robert Brown. *See* Deposition of Michael Busby at 16–17; Affidavit of Clinton Swafford at 2; Affidavit of Thomas Moody at 3; Affidavit of Robert Brown at 2.

13. *See* Deposition of Charles Parks at 7–10; Transcript of October 3, 1986 Preliminary Injunction Hearing at 25–26 (testimony of Raymond Busby); 82 (testimony of Allen Bowman).

14. The testimony of defendants Terrell and Crowe, as well as that of Jim Pemberton support this contention. *See* Deposition of Donald Terrell at 15–19; Deposition of Keith Crowe at 10–11; Affidavit of Jim Pemberton at 1–2. Furthermore, defendants contend that Michael Busby, himself, acknowledged the truth of this contention at an informal WCES Board meeting just three days prior to the preliminary injunc-

fendants' position that the dealership agreements were intended to, and did in fact impose such territorial restrictions.[15] Defendants further contend that Michael Busby never presented WCMT's letter to WCES' Board, that the Board, therefore, never addressed WCMT's objection to NCWC's actions, and that Michael Busby falsified the portion of WCES' response which concerned that objection.[16] NCWC, however, claims that Busby distributed a copy of the letter to all directors present at WCES' October 25, 1983 Board meeting, and that the Board addressed all of the issues presented by the letter and directed Busby to draft the above response.[17]

During the months following this exchange of letters, both NCWC and WCMT solicited customers and engaged in business in each other's territories.[18] WCMT, however, continued to complain and object. Apparently in response to WCMT's complaints, Michael Busby prepared and WCES' Board, at its September 25, 1984 meeting, adopted a proposed policy statement which would have required area dealers who solicited and did business in another dealer's territory to pay that dealer a five percent commission on any completed project. By its terms, however, the policy did not become effective unless it was approved by all area dealers. Because NCWC refused to approve the policy, it was never adopted.[19] Interterritory competition between NCWC and WCMT, therefore, continued.

In late 1985 and early 1986, WCES was sold to a group of investors, including defendants Terrell, Crowe, and the Smiths. Following the completion of that transaction, the composition of WCES' Board changed drastically. The new board consisted of defendants Terrell, Crowe, the Smiths, W.C. Allen, and Michael Busby. Although defendants Terrell, Crowe, and the Smiths acquired only 44 percent of WCES, they constituted a majority of WCES' newly-formed Board.

Shortly after ownership of WCES changed hands, WCMT lost several jobs in Davidson County in direct competition with NCWC. Had WCMT secured those jobs, it would have received approximately $120,-000 to $150,000 in gross revenues. WCMT admittedly lost those jobs because NCWC submitted a lower bid for identical service. According to WCMT, NCWC was able to submit a lower bid solely because it "took a

tion hearing held in this case on October 3, 1986. For testimony in support, *see* Affidavit of W.C. Allen at 3; Affidavit of Kimberly Redd at 2. Finally, the testimony of Glenn Lawrence, who served as a WCES director until January, 1986, also supports this contention. *See also* Affidavit of John Baugh at 2 (a member of WCES' Board at time dealerships first sold and considered).

**15.** Defendants argue persuasively that it would have made no economic sense for them to have paid $40,000 for a second area dealership, unless they truly believed that the dealership agreements imposed protective territorial sales restrictions.

**16.** WCMT's letter contained two objections; one concerning NCWC's territorial crossings and another concerning engineering fees. The response drafted by Michael Busby addressed both of these complaints. The minutes of the October 25, 1983 board meeting, however, do not indicate that the Board discussed WCMT's objection to NCWC's actions, nor do they indicate that a copy of WCMT's letter was distributed to the directors. NCWC has not offered any explanation for these omissions. Furthermore, John Baugh, who in his affidavit claims to have

been on WCES' Board until mid-1985 but who NCWC alleges was not present at the time WCES' Board discussed its response to WCMT's letter, contends that Michael Busby never advised the Board that NCWC was selling in another dealer's territory, and that the Board was never asked to change its original policy and permit territorial crossings. *See* Affidavit of John Baugh at 3.

**17.** This version of the facts is supported by the testimony of both Michael Busby and Clinton Swafford, a member of WCES' Board at the time who was present at the October 25, 1983 meeting and who drafted the cover letter under which WCES' response was sent to WCMT. *See* Affidavit of Clinton Swafford at 4–5.

**18.** According to defendant Terrell, at the time WCMT received Michael Busby's response to their letter, WCMT had no reason to believe that he was misrepresenting the position of WCES and thought that the best thing to do was avoid a costly court battle and begin selling in NCWC's territory. *See* Affidavit of Donald Terrell at 4.

**19.** All other area dealers were willing to sign and approve the policy statement.

free ride" on WCMT's good will and reputation in Davidson County.

Following the loss of these jobs, defendants took several actions. First, in June, 1986, defendant Terrell, acting independently[20] but admittedly on behalf of WCMT, decided to stop selling heatshield to NCWC. WCES, through WCM, initially purchased heatshield in bulk quantities from Metallized Products, Inc., a company located in Boston, Massachusetts. WCM then resold the heatshield to area dealers at a price substantially lower than that charged by any other area supplier. Sometime in 1983, because WCES was financially unable to continue this practice, WCMT voluntarily assumed the responsibility for doing so. According to a letter written by defendant Terrell to Ace Insulation Company dated August 12, 1985, WCMT was appointed by Metallized Products, as an authorized heatshield dealer. Despite this letter, defendants contend that WCMT was simply a Watt Count area dealer purchasing material in bulk and selling to other area dealers as a professional courtesy. At no time were Watt Count area dealers required to purchase heatshield from WCES, WCM, or WCMT.

Second, in late July or early August, 1986, defendants Terrell and Crowe began contemplating filing a complaint against NCWC with the State of Tennessee Board of Licensing Contractors (Contractor Licensing Board). The idea to file the complaint originated shortly after NCWC obtained a job in WCMT's territory worth approximately $70,000 to $80,000. Defendant Crowe initiated the process by calling the Contractor Licensing Board to determine whether NCWC was required to obtain a license for such a large job. After describing the nature of NCWC's work to the Contractor Licensing Board representative, Crowe asked whether a complaint against NCWC should be filed. According to Crowe, the representative advised him to do so. Crowe, therefore, asked the representative to send him a complaint form and a copy of the contractors' license law. On August 6, 1986, after reading the license law, defendants Terrell and Crowe, believing that NCWC was required to obtain a contractors' license, filed a complaint against NCWC for engaging in heating, ventilating and air-conditioning subcontractor work worth in excess of $50,000. At the time the complaint was filed, defendant Crowe was aware that defendant Smith, III was a member of the Contractor Licensing Board. Defendants Smith, Jr., Smith, III, and Stephen Smith, however, did not know that the complaint was contemplated or filed until after the fact.[21] The Contractor Licensing Board subsequently dismissed the complaint. Smith, III took no part in the decision and had nothing to do with processing the complaint.

Finally, in August, 1986, defendant Terrell, speaking on behalf of WCMT, asked WCES' Board to stop NCWC from soliciting or doing business in WCMT's territory.[22] After discussing the problem at length, the Board passed a resolution directing WCES' attorney to write letters to both NCWC and WCMT.[23] The letters were to inform both companies that WCES would refuse to provide engineering services for or guarantee any work performed outside an area dealer's assigned territory. The letters were also to warn both companies that WCES would terminate their franchises if they violated the territorial restrictions. At the time this resolution was passed, the board of WCMT constituted a majority of WCES' Board. With the exception of Michael Busby, who voted against the resolution, and defendant

---

**20.** NCWC contends that although defendants Crowe and the Smiths were not directly involved, they either approved of or acquiesced in Terrell's action.

**21.** NCWC contends, however, that WCMT's remaining board members subsequently approved of or acquiesced in defendants Terrell and Crowe's actions. NCWC further contends that the complaint was meritless and that it was filed by defendants Terrell and Crowe with full knowledge of its groundless nature.

**22.** Prior to addressing WCES' Board, Terrell consulted with WCMT's remaining board members on an informal basis.

**23.** Defendant Allen moved that the Board adopt the resolution.

Smith, III,[24] who was not present at the meeting, all of WCES' board members—defendants Terrell, Crowe, Smith, Jr., Stephen Smith, and Allen—voted for the resolution. WCES' attorney sent a letter to this effect to NCWC on August 21, 1986.[25] This litigation followed.

## II. *Legal Discussion*

### A. *Antitrust Claim*

Historically, courts have been reluctant to dispose of complex antitrust litigation on motions for summary judgment. *See Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 947 (6th Cir.1983). This reluctance "stems from the crucial role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference." *Id.* This does not mean, however, that summary judgment should never be granted in antitrust actions. To survive a motion for summary judgment, "the plaintiff must provide some factual basis from which elements of intent and conspiracy may be reasonably inferred." *Potters Medical Center v. The City Hospital Association*, 800 F.2d 568, 572 (6th Cir.1986). In disposing of such motions, the "evidence must be viewed in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences." *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1197 (6th Cir.1982), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1718,

80 L.Ed.2d 190 (1984).[26] "Only if the evidence is not disputed as to any genuine issue of material fact should the case be decided as a matter of law." *Hand v. Central Transport, Inc.*, 779 F.2d 8, 10 (6th Cir.1985).

Section 1 of the Sherman Act proclaims that "[e]very contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." 15 U.S.C. § 1 (1973). To establish a claim under section 1, a plaintiff must prove:

(1) that the defendant entered into a contract, combination, or conspiracy;

(2) that the contract, combination, or conspiracy was either "in" or affected interstate or foreign commerce; and

(3) that the contract, combination, or conspiracy unreasonably restrained such commerce.[27]

*See White and White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983); *Continental Cablevision of Ohio, Inc. v. American Electric Power Co.*, 715 F.2d 1115, 1118 (6th Cir.1983).

In their motion for summary judgment, defendants argue that NCWC has failed to present evidence sufficient to create a genuine issue for trial as to both the alleged conspiracy in this case and the alleged restraint's effect on interstate commerce. Defendants' arguments, however, are unpersuasive. Although evidence of WCES'

---

**24.** Although Smith, III was not present, NCWC claims that he impliedly approved of the Board's action and the content of the letter sent to NCWC by failing to subsequently dissent.

**25.** It is unclear whether a similar letter was ever sent to WCMT.

**26.** *But see Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538, 553 (1986) ("antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case").

**27.** NCWC seeks both damages under 15 U.S.C. § 15 (Supp.1987) and permanent injunctive relief under 15 U.S.C. § 26 (Supp.1987). It is well established that proof of *actual* "antitrust injury" is a necessary prerequisite to recovering damages under section 15. *See Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97

S.Ct. 690, 697, 50 L.Ed.2d 701, 712 (1977). Similarly, in order to obtain injunctive relief under section 26, NCWC must show a *threat* of "antitrust injury." *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. ——, ——, 107 S.Ct. 484, 491, 93 L.Ed.2d 427, 438 (1986). NCWC must show more than an injury causally linked to an antitrust violation. *Id.* at ——, 107 S.Ct. at 488, 93 L.Ed.2d at 435. It must show both an actual and threatened injury "of the type the antitrust laws were designed to prevent and that flows from that which makes a defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, 50 L.Ed.2d at 712. Contrary to defendants' contention, NCWC has met this burden by presenting evidence which tends to show that defendants' alleged unlawful conduct reduced competition in the Middle Tennessee market for Watt Count services and that NCWC has been and will be injured by that reduction in competition. Defendants' motion for summary judgment, therefore, to the extent that it was based on this issue, is denied.

refusal to deal with NCWC cannot, by itself, support a finding of antitrust liability under section 1, *see Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 758–64, 104 S.Ct. 1464, 1467–71, 79 L.Ed.2d 775, 782–86 (1984), NCWC clearly has presented evidence that reasonably " 'tends to exclude the possibility' that [WCES and WCMT] acted independently." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d at 553.[28] Furthermore, although the alleged restraint in this case was not itself "in commerce," NCWC has presented evidence of conduct that, " 'as a matter of practical economics' ... [has] a not insubstantial effect" on interstate commerce.[29] *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441, 453 (1980) (quoting *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 745, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338, 344 (1976)). Accordingly, defendants' motion for summary judgment on NCWC's antitrust claim is denied.[30]

Although NCWC has presented sufficient evidence from which a reasonable finder of fact could conclude that WCES conspired with WCMT and the individually-named defendants to restrain interstate commerce, the difficult issue presented by this case is whether NCWC has presented evidence sufficient to create a genuine issue for trial as to the reasonableness of that restraint. Defendants argue that NCWC has not, and therefore that NCWC's motion for summary judgment on this issue should be denied.

Traditionally, courts have applied a "rule of reason" approach to determine whether a particular business arrangement unreasonably restrains interstate or foreign commerce in violation of section 1. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515, 525 (1972). The United States Supreme Court described this "rule of reason" approach in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.

246 U.S. at 238, 38 S.Ct. at 244, 62 L.Ed. at 687, *quoted with approval in Davis–Watkins*, 686 F.2d at 1196.

Although most business arrangements are analyzed under this "rule of reason" approach, courts have characterized certain types of business agreements or practices as *per se* violations of section 1. Such "agreements or practices ... because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545,

---

**28.** It is undisputed that WCES and WCMT, while separate economic entities, are commonly-controlled corporations. Furthermore, defendants do not dispute that WCES' refusal to deal with NCWC was designed to either impose or enforce territorial sales restrictions, and that WCMT had a practical economic motive for encouraging such action on WCES' part. Finally, it is clear that WCES' alleged misconduct did not occur until after WCMT gained some measure of control over WCES.

**29.** As NCWC points out, by threatening to terminate NCWC's franchise, WCES effectively restricted NCWC's business activity to a limited territory. NCWC's consumption of heatshield —a product that traveled in interstate commerce—therefore, decreased. The record clearly shows that NCWC purchased heatshield produced by Metallized Products, Inc., a corporation located in Boston, Massachusetts. It is therefore irrelevant that NCWC could have obtained heatshield from an intrastate source.

**30.** *See also, supra*, n. 25 (disposing of defendants' only other argument—that NCWC has not presented evidence of an "antitrust injury").

549 (1958). "It is only after considerable experience with certain business relationships," however, that courts will classify them as *per se* violations of section 1. *Topco*, 405 U.S. at 607, 92 S.Ct. at 1133, 31 L.Ed.2d at 525.

Restraints of trade generally are characterized as either vertical or horizontal. Although "[t]here may be occasional problems" in distinguishing between vertical and horizontal restrictions, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58 n. 28, 97 S.Ct. 2549, 2561 n. 28, 53 L.Ed.2d 568, 585 n. 28 (1977), such a distinction is critical. Vertical restraints are agreements between persons or business entities at different levels of the market structure. *See Topco*, 405 U.S. at 608, 92 S.Ct. at 1133, 31 L.Ed.2d at 526. Horizontal restraints, on the other hand, are agreements between competitors at the same level of the market structure. *Id.* at 608, 92 S.Ct. at 1133, 31 L.Ed.2d at 525. Because vertical non-price restraints "are generally found to be potentially beneficial to interbrand competition," *Davis–Watkins*, 686 F.2d at 1196, such restrictions traditionally have been scrutinized under the "rule of reason" approach. Horizontal restraints, however, "have been characterized as 'naked restraints of trade with no purpose except stifling competition." *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738, 746 (1963)), *quoted in, Com-Tel, Inc. v. Dukane Corp.*, 669 F.2d 404, 409 (6th Cir.1982). Such restraints, therefore, are generally regarded as *per se* violations of section 1.

■ The truly difficult question presented by this case is whether defendants' conduct should be characterized as a vertical or horizontal restraint of trade. Although a particular market restriction may, at first glance, appear to be vertical in nature, a more thorough examination of the underlying business arrangement involved may reveal that the restriction is, in fact, a *per se* unreasonable horizontal restraint. *See,*

*e.g., United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Topco, supra.* To determine whether a particular market restriction is vertical or horizontal in nature, district courts in this circuit must focus their inquiry upon the effect and purpose of the restriction. *See Davis–Watkins*, 686 F.2d at 1197; *Advisory Information and Management Systems, Inc. v. Prime Computer, Inc.*, 598 F.Supp. 76, 84–85 (M.D.Tenn.1984). The purpose of a given market restriction may be discovered by identifying the source of the restriction and determining whether the restriction is consistent with the source's market strategy. *Id.*

NCWC argues that defendants' conduct constitutes a *per se* unreasonable horizontal restraint. It contends that WCMT and the individually-named defendants conspired with WCES to prevent NCWC from competing with WCMT in the Middle Tennessee market for Watt Count area dealer services. More specifically, NCWC claims that defendants, after acquiring control over WCES, attempted to force NCWC to comply with territorial sales restrictions by refusing to deal with NCWC and threatening to terminate NCWC's franchise. According to NCWC, territorial sales restrictions were never intended and are inconsistent with WCES' market strategy.

NCWC further contends, and presents sufficient evidence from which a reasonable finder of fact could conclude, that defendants were motivated by a desire to protect WCMT from price competition in the Middle Tennessee area. Although the majority of the economic pressure exerted upon NCWC appears to have been applied unilaterally by WCES-a vertical "upstream" entity-NCWC argues that WCES was nothing more than a tool "for the imposition and enforcement of horizontal restrictions." According to NCWC, defendants took advantage of their control over WCES "to initiate a course of conduct that could benefit only [WCMT]." *Com-Tel*, 669 F.2d at 412. Such conduct, NCWC argues, "must be viewed as a horizontal attempt to exclude a competitor on the horizontal level and to restrict intrabrand

competition without an offsetting benefit to interbrand competition. *Id.*

Defendants disagree. They contend that their conduct should be characterized as a vertical attempt to enforce territorial sales restrictions and, therefore, analyzed under the "rule of reason" approach. Defendants have presented evidence which suggests that territorial sales restrictions were always intended and that Watt Count area dealerships were sold based upon that understanding. According to defendants' version of the facts, WCES did not alter that policy until after Michael Busby's father and brother-in-law purchased NCWC and began selling the Watt Count System in WCMT's territory.

Defendants deny that their attempt to enforce territorial sales restrictions was motivated by a desire to protect WCMT from legitimate price competition. Instead, defendants claim that they merely sought to enforce NCWC's area dealership agreement as it was written and originally intended. According to defendants, such territorial restrictions remain vital if WCES is to compete successfully with other energy conservation system providers.[31]

The peculiar facts of this case present an unresolved question in this circuit: Does an agreement between a *single* "upstream" entity, such as WCES, and a *single* "downstream" entity, such as WCMT, under which the "upstream" entity agrees to refuse to deal with a price-cutting horizontal competitor of the "downstream" entity, constitute a *per se* violation of section 1 of the Sherman Act? The United States Court of Appeals for the Sixth Circuit specifically avoided reaching this issue in *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir.1982). *See also Com–Tel,* 669 F.2d at 413 n. 16. Fortunately, this question has been the subject of considerable litigation in other circuits. Those circuits, however, have disagreed on how to resolve the issue.

Several circuit courts have held that such an agreement does not constitute a *per se* violation of section 1 *unless* the refusal to deal was made pursuant to a *price-mainte-nance agreement* between the "upstream" and "downstream" entities. *See McCabe's Furniture, Inc. v. La–Z–Boy Chair Co.,* 798 F.2d 323, 329 (8th Cir.1986); *Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1435 (7th Cir.1986); *Westman Commissions Co. v. Hobart Int., Inc.,* 796 F.2d 1216, 1222–24 (10th Cir.1986); *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d 1212, 1216 (5th Cir.1986). According to these circuits, it is not enough for the jury to find that the "upstream" entity refused to deal with the competitor *to reduce price competition* at the horizontal level. *See, e.g., Business Electronics,* 780 F.2d at 1216. There must be evidence that the horizontal competitor was terminated pursuant to an agreement between the "upstream" and "downstream" entities to fix prices at a specific level. *Id.* "[T]he mere fact that the ["upstream" entity] may be motivated by antipathy to price competition is irrelevant." *Morrison,* 797 F.2d at 1440. The rationale of these circuits appears to be that because the "upstream" entity's *motivation* in refusing to deal with the competitor may be either legitimate[32] or illegitimate, and because regardless of the "upstream" entity's motivation its *attitude* will appear to be "one of hostility toward price cutters," neither the jury nor the court should be permitted to choose which motive may have predominated. *See, e.g., Morrison,* 797 F.2d at 1440; *Business Electronics,* 780 F.2d at 1217–18. *But see McCabe's,* 798 F.2d at 329 ("jury must determine whether ... nonprice justifications ... are legitimate, or are mere pretext to disguise a per se illegal agreement ... to maintain resale prices").

---

**31.** According to defendants, territorial restrictions also enhance intrabrand competition "by forcing each dealer to develop and promote his own territory rather than take a free ride off another dealer's efforts." Brief of Defendants in Opposition to Plaintiff's Motion for Summary Judgment at 12.

**32.** For example, an "upstream" entity's refusal to deal may be motivated by a desire to enforce a reasonable non-price vertically-imposed territorial restriction. Defendants contend that this is exactly what WCES was doing in this case.

Other circuit courts, however, have held that such an agreement constitutes a *per se* violation of section 1 if the "upstream" entity's refusal to deal was primarily motivated by a desire to protect the "downstream" entity from price competition at the horizontal level. *See O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986); *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (8th Cir.1985); *Zidell Explorations, Inc. v. Conval International, Ltd.*, 719 F.2d 1465, 1469-71 (9th Cir.1983); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 170 (3d Cir.1979). These circuits subscribe to the view that although the "upstream" entity's refusal to deal appears to be a unilaterally-imposed vertical restraint, if the refusal to deal is made "at the direction of [a "downstream" entity] ... seeking to suppress its competition by utilizing the power of a common ["upstream" entity]," the restraint's purpose and effect becomes primarily horizontal in nature. *See Cernuto*, 595 F.2d at 168. According to these circuits, "[i]f the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is ... illegal *per se*." *Id.* at 169.

■ This Court agrees with the *Cernuto* court that if the "upstream" entity's decision to refuse to deal with the horizontal competitor "was in fact its own—the result of its own marketing strategy and judgment—... the alleged conduct would be unilateral in nature and might be found to possess the pro-competitive redeeming virtues that would defeat the application of a *per se* rule." *Id.* at 170. If, however, the "upstream" entity's decision was made at the "downstream" entity's request and with an intent to restrain intrabrand price competition, application of a *per se* rule would be appropriate. The plaintiff need not present evidence of a price-fixing agreement between the "upstream" and "downstream" entities. Such an approach is consistent with the limited direction provided by the Sixth Circuit in *Davis–Watkins*.

■ In light of the above, it is clear that the merits of NCWC's antitrust claim must ultimately turn on the question of motive. The ultimate question must be: Was WCES' refusal to deal motivated by a desire to enforce pre-existing, vertically-imposed territorial sales restrictions as defendants suggest, or did WCES refuse to deal with NCWC at WCMT's request in order to eliminate intrabrand price competition in the Middle Tennessee market for Watt Count area dealer services and thereby enable WCMT to maintain prices at its own preferred levels? Given that both parties have presented sufficient conflicting evidence concerning WCES' original market strategy and defendants' motive in refusing to deal with NCWC, this question must be answered by the finder or fact. Summary judgment on this claim, therefore, is inappropriate.

## B. *RICO Claim*

NCWC also claims that defendants violated the substantive RICO offense set forth in 18 U.S.C. § 1962(c) (1984).[33] In order to establish a section 1962(c) violation, NCWC must prove:

(1) the existence of an enterprise which affects interstate or foreign commerce;

(2) that the defendant was employed by or associated with the enterprise;

(3) that the defendant participated in the conduct of the enterprise's affairs; and

(4) that the defendant participated through a pattern of racketeering activity.

*See United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984).

The term "enterprise" includes "any individual, partnership, corporation, associa-

---

**33.** Section 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partic-

ipate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
18 U.S.C. § 1962(c) (1984).

tion, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[34] 18 U.S.C. § 1961(4) (1984). An enterprise "is proven by the existence of a continuing organization and by evidence that members function as a continuing unit" for a common purpose. *Sinito*, 723 F.2d at 1262. Although the existence of an enterprise is a separate element of a section 1962(c) violation, there need not be "proof of an enterprise distinct from proof of a pattern of racketeering." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir.1985) (citing with approval *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983)). *But see United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983) (holding that enterprise must have existence separate and apart from the alleged pattern of racketeering activity). It is well settled that the "enterprise need only have a minimal impact upon interstate commerce." *United States v. Robinson*, 763 F.2d 778, 781 (6th Cir.1985).[35]

■ Defendants argue that NCWC has not presented sufficient evidence of an enterprise distinct from the individual RICO defendants. In addition, defendants contend that the enterprise alleged by NCWC has no effect whatsoever on interstate commerce. The Court disagrees. NCWC has presented uncontroverted evidence which establishes the existence of a legitimate "association in fact" consisting of Watt Count area dealers, WCM, and WCES. It is undisputed that this "association in fact" is a continuing organization, the purpose of which is to provide and sell energy conservation systems. Its individual members function as a continuing unit and engage in business in several states. While it is true that some courts have held that a defendant cannot simultaneously be both a "per-

son" and an "enterprise" under section 1962(c), *see, e.g., Bennett v. United States*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), the facts of this case do not present such a dilemma. NCWC has presented uncontroverted evidence of a distinct RICO enterprise. The fact that defendants WCMT, WCM, and WCES are members of that enterprise is irrelevant.

■ NCWC, however, must prove more than the existence of an enterprise which affects interstate commerce. It must also prove that each individual defendant participated in the conduct of that enterprise's affairs through a pattern of racketeering activity.[36] The term "racketeering activity" encompasses a variety of federal and state crimes, including the racketeering activity alleged in this case; extortion in violation of 18 U.S.C. § 1951 (1984) and Tenn. Code Ann. § 39–2–701 (1982), and mail fraud in violation of 18 U.S.C. § 1341 (1984). *See* 18 U.S.C. § 1961(1) (Supp. 1987). A "pattern" of racketeering activity "requires at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1984). These acts are more commonly referred to as "predicate acts." In order to prove that defendants conducted the affairs of the alleged enterprise "through" a pattern of racketeering activity, "there must be a nexus between the enterprise and the racketeering activity." *Qaoud*, 777 F.2d at 1115.

NCWC alleges that defendants have committed four predicate acts of racketeering activity. It argues that defendants extorted or attempted to extort property from NCWC in violation of both 18 U.S.C. § 1951 and Tenn.Code Ann. § 39–2–701 by: (1) threatening to terminate NCWC's Watt Count franchise unless NCWC agreed to

---

**34.** It is well settled that section 1962(c) applies to legitimate as well as illegitimate enterprises. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 253 (1981).

**35.** It is the enterprise itself, not the conduct of each individual defendant that must affect interstate commerce. *See United States v. Groff*, 643

F.2d 396, 400 (6th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 103 (1981).

**36.** It is undisputed that defendants are all "employed by or associated with" the alleged enterprise. *See* 18 U.S.C. § 1962(c) (1984).

comply with territorial sales restrictions; (2) refusing to sell NCWC heatshield; and (3) filing a meritless complaint against NCWC with the Contractor Licensing Board. NCWC also argues that defendants committed a single act of mail fraud in violation of 18 U.S.C. § 1341 by using the mails for the purpose of executing a scheme to fraudulently induce the Contractor Licensing Board to take action against NCWC. According to NCWC, defendants intentionally misrepresented to the Licensing Board that NCWC was doing business in violation of Tenn.Code Ann. § 62–6–103 (1986). In response, defendants argue, and the Court agrees, that NCWC has not presented sufficient evidence to establish a valid civil RICO claim for the predicate offenses it alleges.

■ Even if the Court assumes that defendants knew that the complaint filed against NCWC with the Contractor Licensing Board was meritless and contained false representations of fact, such conduct is neither chargeable under Tenn.Code Ann. § 39–2–701, nor indictable under either 18 U.S.C. § 1341 or 18 U.S.C. § 1951. By filing a meritless and false complaint against NCWC, defendants may have attempted to harass, but they did not "maliciously threaten" NCWC in violation of Tenn.Code Ann. § 39–2–701.[37] Furthermore, because defendants did not, in any way, delay, obstruct, interrupt or otherwise adversely affect interstate commerce by taking such action, no violation of 18 U.S.C. § 1951 has occurred.[38] Finally, because the alleged misrepresentations made by de-

fendants in the complaint "could not have been reasonably calculated to deceive" a government entity such as the Contractor Licensing board, NCWC has not established a "scheme to defraud"—an essential element of mail fraud in violation of 18 U.S.C. § 1341.[39]

■ Similarly, WCMT's refusal to sell heatshield to NCWC, although admittedly motivated by NCWC's territorial crossings, does not constitute an act of extortion under either Tenn.Code Ann. § 39–2–701 [40] or 18 U.S.C. § 1951. "Extortion" is defined in 18 U.S.C. § 1951(b)(2) as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." It is well settled that fear of economic loss may be a sufficient basis for a finding of extortion, but "only if it [is] actual and reasonable and [the] defendant knew of and intentionally made use of such actual fear." *United States v. Russo*, 708 F.2d 209, 214 (6th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983). *See also United States v. Cusmano*, 659 F.2d 714, 715 (6th Cir.1981). Given that the individual defendants effectively controlled WCMT, WCM, and WCES at the time, WCMT's refusal to sell heatshield to NCWC could have *created* in NCWC a reasonable fear of economic loss—a fear of further economic reprisals. There is absolutely no evidence in the extensive record of this case, however, which suggests that NCWC

---

**37.** Tenn.Code Ann. § 39–2–701 (1982) makes it unlawful for any person to:

maliciously threaten to accuse another of a crime, offense, or immoral act, or to do any injury to the person, reputation or property of another, with intent … to extort any money, property, or pecuniary advantage whatever, or to compel the person so threatened to do any act against his will. . . .

**38.** 18 U.S.C. § 1951(a) (1984) makes it unlawful for any person to obstruct, delay, or affect commerce or the movement of any article in commerce by using, attempting to use, or conspiring to use extortionate means. An essential element of a section 1951(a) violation, therefore, is proof that the extortionate transaction has at least a *de minimus* effect on interstate commerce. *See*

*United States v. Harding*, 563 F.2d 299, 301–02 (6th Cir.1977).

**39.** The Court is convinced that an ordinary and prudent government board such as the Contractor Licensing Board would not have merely accepted the representations made in the complaint. In fact its function is to verify those representations and determine whether a license is required. *Cf. Blount Financial Services, Inc. v. Walter E. Heller and Co.*, 819 F.2d 151, 153 (6th Cir.1987).

**40.** By refusing to sell heatshield to NCWC, defendants in no way "maliciously threatened" to take any action against NCWC. Such conduct, therefore, did not violate Tenn.Code Ann. § 39–2–701.

actually had such a fear.[41] Furthermore, even if WCMT's refusal aroused an actual fear of economic loss in NCWC, there is no evidence to indicate that defendants did anything to exploit or use that fear in an attempt to obtain property from NCWC.

Consequently, even if defendants committed an act of extortion in violation of Tenn.Code Ann. § 39-2-701 and/or 18 U.S.C. § 1951(a) by threatening to terminate NCWC's franchise, NCWC has not presented sufficient evidence from which a reasonable finder of fact could conclude that defendants conducted or participated in the conduct of a RICO enterprise through a pattern of racketeering activity. Defendants' motion for summary judgment on this claim, therefore, is granted. Defendants, however, are not entitled to an award of attorney's fees and costs incurred as a result of defending this claim.

---

**41.** In fact, Allen Bowman, President of NCWC at the time, has admitted that he did not even now why WCMT refused to sel NCWC heatsh-

ield. *See* Transcript of October 3, 1986 Preliminary Injunction Hearing at 104.